JOHN F. ENNIS, ADMINISTRATOR DE BONIS NON OF JOSEPH ZOL-
KOWSKI AND OTHERS, v. J. H. B. SMITH, ADMINISTRATOR OF
GEORGE BOMFORD, LEWIS JOHNSON, ADMINISTRATOR DE BONIS
NON OF THADDEUS KOSCIUSKO, JAMES CARRICO, SAMUEL STOTT,
GEORGE C. BOMFORD, JACOB GIDEON, ULYSSES WARD, AND
JONATHAN B. H. SMITH.

Origin of the fund in controversy.

Mr. Jefferson's letter concerning it.

General Kosciusko made four wills. One in the United States, in 1798; another
in Paris, in 1806; the third and fourth were made at Soleure, in Switzerland, whilst
he was sojourning there in 1816 and 1817.

The first and second wills were revoked by the third, and he died intestate as to his
estate in the United States.

But the first will, before it was known that he had made the others, was probated by
Mr. Jefferson, in Virginia, and when Mr. Jefferson learned that the General had
made other wills, he transferred the fund to the Orphans' Court of the District of
Columbia. The Orphans' Court managed the fund for some time, and then Benja-
min L. Lear was appointed the administrator of Kosciusko, with the will annexed.
He died, leaving a will, and George Bomford one of his executors. Bomford
qualified as such, and afterwards became the administrator of Kosciusko de bonis
non. He took into his possession, as executor, the estate of Lear, and also the
funds of Kosciusko, which had been administered by Lear, and first made his re-
turn to the Orphans' Court of the administered funds of Kosciusko, as executor of
Lear. Afterwards they were returned by him to the Orphans' Court, as adminis-
trator de bonis non of Kosciusko. The Orphans' Court deeming that his sureties
as administrator de bonis non of Kosciusko, were insufficient, or that they were not
liable for any waste of them, on account of the funds having been received by him
as executor of Lear, and not as administrator de bonis non, called upon him for
other sureties, under the act of Congress of the 20th February, 1846. He complied
with the call, and gave as sureties, Stott, Carrico, and George C. Bomford, and
Gideon, Ward, and Smith.

The original bonds of Bomford were given to the Orphans' Court, under the law of
Maryland, which prevailed without alteration in that part of the District of Colum-
bia which had been ceded by Maryland, until Congress passed the act of the 20th
February, 1846. The defendant Stott, Carrico, and George C. Bomford, and Smith,
Ward, and Gideon, became the sureties of Bomford, as administrator de bonis non
of Kosciusko, under the act of 20th February, 1846.

In the State of Maryland, if an executor or administrator changes any part of an
estate from what it was into something else, it is said to be administered. If an
administrator de bonis non, possesses himself of such changed estate, of whatever kind
it may be, and charges himself with it as assets, his sureties to his original bond,
as administrator de bonis non, are not liable for his waste of them. They are only
liable for such assets of the deceased as remain in specie, unadministered by his
predecessor, in the administration. Such is the law of Maryland, applicable to
the sureties of Bomford, in the bond given when he was appointed administrator
de bonis non of Kosciusko.

But when other sureties are called for by the Orphans' Court, under the third section
of the act of February 20, 1846, and are given, they do not bear the same relation
to the administrator that his original sureties did, and they will be bound for the
waste of their principal to the amount of the estate, or funds which he has charged
himself by his return to the Orphans' Court, as administrator de bonis non, when it
called for additional sureties, and for such as the administrator may afterwards
receive.

The bonds taken by the Orphans' Court in this case, were properly taken under the
act of the 20th February, 1846.

General Kosciusko's Olographic will of 1816, contains a revoking clause of all other
wills previously made by him, and not having disposed of his American funds in
that will, nor in the will of 1817, he died intestate as to such funds. The second

Ennis et al. *v.* Smith et al.

article in the will of 1817, "Je légue tous mes effets, ma voiture, et mon cheval y comprise à Madame et à Monsieur Zavier Zeltner, les homme ce dessus," —record, 105 — is not a residuary bequest to them of the rest of his estate, not specifically disposed of in the wills of 1816 and 1817.

General Kosciusko was sojourning in Switzerland when he died, but was domiciled in France, and had been for fifteen years.

His declarations are to be received as proof that his domicil was in France. Such declarations have always been received, in questions of domicil, in the courts of France, in those of England, and in the courts of the United States.

The presumption of law is, that the domicil of origin is retained, until residence elsewhere has been shown by him who alleges a change of it. But residence elsewhere repels the presumption, and casts upon him who denies it to be a domicil of choice, the burden of disproving it. The place of residence must be taken to be a domicil of choice, unless it is proved that it was not meant to be a principal and permanent residence. Contingent events, political or otherwise, are not admissible proofs to show, where one removes from his domicil of origin, for a residence elsewhere, that the latter was not meant to be a principal and permanent residence. But if one is exiled by authority from his domicil of origin, it is never presumed that he has abandoned all hope of returning back. The abandonment, however, may be shown by proof. General Kosciusko was not exiled by authority. He left Poland voluntarily, to obtain a civil status in France, which he conscientiously thought he could not enjoy in Poland, whilst it continued under a foreign dominion.

Personal property, wherever it may be, is to be disturbed in case of intestacy, according to the law of the domicil of the intestate. This rule may be said to be a part of the *jus gentium.*

What that law is when a foreign law applies, must be shown by proof of it, and in the case of written law, it will be sufficient to offer, as evidence, the official publication of the law, certified satisfactorily to be such. Unwritten foreign laws, must be proved by experts. There is no general rule for authenticating foreign laws in the courts of other countries, except this, that no proof shall be received, "which presupposes better testimony behind, and attainable by the party." They may be verified by an oath, or by an exemplification of a copy under the great seal of the State or nation whose law it may be, or by a copy proved to be a true copy, by a witness who has examined and compared it with the original, or by the certificate of an officer authorized to give the law, which certificate must be duly proved. Such modes of proof are not exclusive of others, especially of codes and accepted histories of the law of a country. See also the cases of Church *v.* Hubbart, in 2 Cranch, 181, and Talbot *v.* Seeman, in 1 Cranch, 7. In this case, the Code Civil of France, with this indorsement, "Les Garde des Sceaux de France à la Cœur Supreme Des Etats Unis," was offered as evidence to prove that the law of France was for the distribution of the funds in controversy. This court ruled that such indorsement was a sufficient authentication, to make the code evidence in this case, and in any other case in which it may be offered. By that code, the complainants named in this suit as the collateral relations of General Kosciusko, are entitled to receive the funds in controversy, in such proportions as are stated in the mandate of this court to the court below.

The documentary proofs in this cause, from the Orphans' Court, of the genealogy of the Kosciusko family, and of the collateral relationship of the persons entitled to a decree, and also of the wills of Kosciusko, are properly in evidence in this suit.

The record from Grodno is judicial; not a judgment *inter partes,* but a foreign judgment *in rem,* which is evidence of the facts adjudicated against all the world.

Mr. Justice *Catron* did not sit in this cause.

This was an appeal from the Circuit Court of the United States for the District of Columbia, holden in and for the county of Washington, sitting as a Court of Equity.

The whole case is set forth in the opinion of the court.

34 *

The appellants were those who filed the bill in the Circuit Court, which was dismissed by that court.

It was argued by *Mr. Tockman* and *Mr. Johnson*, for the appellants, and by *Mr. Redin*, *Mr. Marbury*, and *Mr. Coxe*, for the appellees.

The points raised by the counsel for the appellants, were the following:

I. Was Kosciusko's domicil, at the time of his death, in France, as the appellants charge, or was it in Poland, as the appellees maintain?

It could not be in Poland, since Kosciusko left it, because of its subjugation by the foreign powers, in 1794. Vattel's Law of Nations, Book I. chap. 16, § 195.

It was in France, by his own choice, since 1806 until 4th of June, 1816. (Wills of 1806 and 1816, and conclusions resulting from the admission of the appellees.) Story's Confl. of Laws, § 44–46, § 8–47, § 14.

It continued to be in France until his death, upon the principle of law laid down in 1 Starkie on Evid. (Philad. ed. of 1842, p. 53, " Presumption as to Continuance.") 1 American Leading Cases, by Hare & Wallace, p. 710, § 3, and the authorities therein referred to; Story's Confl. of Laws, § 47, § 16

II. Has the will of 1816 been proved? Have the letters of administration *de bonis non* to Lewis Johnson been issued with the wills of 1798, 1806, and 1816, as alleged in the bill? Does the will of 1816 revoke the wills of 1798 and 1806? Is the residue of Kosciusko's property liable for the legacies stated in the wills of 1816 and 1817?

The original will of 1816 was proved, recorded, and is lodged for safe keeping in France, and its authenticated exemplification with the French probate was proved and recorded in the Orphans' Court for the District of Columbia, pursuant to the rules laid down in Toller on Evid. p. 71. Van Rensselear *v.* Morris, 1 Paige's Rep. 13; Story's Confl. of Laws, notes to § 514 b, on p. 432 of the 2d ed.; Statute of Maryland of 1785, chap. 46, § 2; De Sobre *v.* De Laistre, 2 Har. & Johns. 191.

The letters of administration *de bonis non* to Lewis Johnson were issued with tl! will and other two, as charged in the bill, proved by the decretal of the Orphans' Court, and the deposition of the record of the wills.

The court below had, and this court has now, the power of deciding what effect each of these three wills of Kosciusko should have upon the final disposition of the property sought to be recovered. 1 Jarman on Wills, 4, 22, 23, &c.

For this purpose the law of the domicil of Kosciusko at the time of his death must be resorted to. Jarman on Wills, 3, 4; Story's Confl. of Laws, § 465, 467, 468, 479 f, 479 m.

The will of 1798 cannot take effect, because of the uncertainty of its dispositions and objects of the bounty; the will of 1806 is null and void, not being executed according to either of the forms prescribed by the laws of France for making wills; but, good or bad, they have been both revoked by the will of 1816.

The will of 1816, containing the revoking clause of former wills, is a good and valid olographic will, proved by the depositions on p. 15 and 16 of the record. Arts. 970, 999, 1001, of the Civil Code of Napoleon.

Parol evidence, referred to in the answers, has not been produced; but, if it were produced, it could not be received, to impeach the will of 1816, nor to prove its revocation. Civil Code of Napoleon, Arts. 1035, 1036; 12 Wheaton's Rep. 175; Toller on Exec. 76; 1 Madd. Ch. Pr. 81, 552, 555; 2 Starkie on Evid. Part I. Phil. ed. of 1842, 756, and Part II. p. 1284, note a; 1 Greenleaf on Evid. § 273, 290.

The word "effets," used in the 2d clause of the will of 1817, being restrained by the words "ma voiture et mon cheval y comprise," passes only property of "ejusdem generis," and nothing else. 1 Jarman on Wills, 692 f; 13 Ves. 36, 45.

Independent of this, the French word "effets" signifies only such property as is about the person. Dictionaire Francais et Anglais, par les Professeur Fleming et Tibbins; Dictionaire de l'Academie Française.

Admitted, that for the legacies specified in the will of 1816, the property sought to be recovered, and every other property of Kosciusko, would be liable — but all these legacies had been paid.

The legacies made by the will of 1817 being legacies of specific funds, which were invested in Switzerland and in England, and of such specific property which was left in the house where Kosciusko died, in Switzerland, none of them can charge any other property; but whatever may be the law in this respect, the proof is that these legacies have also been paid.

The accidental omission, in the proceedings, of Mr. and Mrs. Zavier Zeltner, legatees under the will of 1817, is immaterial: first, because they take only such property in kind as comes within the definition of the word "effets," restrained by the words "ma voiture et mon cheval y comprise," and should claim it from those persons in Switzerland in whose possession these "effets" were left; secondly, because, by the law of France, upon the death of the testator or intestate, the property vests in

the lawful heirs, who stand *in loco* of legal representatives of the deceased at common law.   Civil. Code of Napoleon, Art. 724; Story's Confl. of Laws, § 507, 508, 516.

It follows, from the above rule, that when the lawful heirs of Kosciusko recover the property which is not wanted here by local administrator, all claimants residing in Europe, whether they are legatees or creditors, will have a right to establish there their claims.   It would be immaterial, then, were all the claimants residing in Europe omitted in these proceedings, as no decree *pro confesso* taken here will bar their claims there.   Civil Code of Napoleon, Arts. 724, 870, 873, 1011, 1025, 1026.

Admitting, for the sake of argument, the existence of such European claims, this is no defence; the appellees in such a case should bring money into court — show good reasons of their apprehension for safety, and pray that the appellants may interplead their right with other claimants.   2 Story's Com. on Eq. § 805, 809, &c.; Mitf. Eq. Plead. by Jeremy, p. 48, 49.

III. Have the appellants proved that Kosciusko died unmarried and without issue, and that they are his next of kin, entitled to the residue of undisposed of property?   " In civil cases, slight evidences of right or title are sufficient — as against a stranger who possesses no color of title."   1 Starkie on Evid. Phil. ed. of 1842, p. 544.   In case of Folger's Lessee *v.* Simpson, (1 Yeates's Rep. 17,) *ex parte* affidavit, made in England, was held to be sufficient evidence of pedigree against strangers. Kingston *v.* Lesley, 10 Sergeant & Rawle's Rep. 383.   The appellees are all strangers, having no color of title to the estate of Kosciusko.   The appellants, to establish their title thereto, produce a decree of the nobility of the Government of Grodno, and a decree of the Court of Kobryn, in the province of Lithuania, formerly Poland, now a part of the Empire of Russia, which were proved as to their authenticity, and as to the competency of the tribunals which passed them; first, in the Orphans' Court for the District of Columbia, in the course of legal proceedings against Bomford, deceased administrator, and subsequently, by depositions taken under the commission in the case.

The originals of these foreign decrees, written in the Russian language, are on file in the court below.   Their translations will be found on p. 73, Exhibit A, and on p. 80, Exhibit B.   These translations are judicial — they were made under oath, taken in open court.   The originals, written in the Russian language, are not in the record, from reasons stated in the answer of the clerk of the court below.

The authenticity of these documents has been established by the testimony that the seal of the Assembly of the Nobility on

the decree of pedigree, (marked A, on p. 73,) and the seal of the Court of Kobryn in the decree (marked B, on p. 80,) are genuine seals, which alone is sufficient, under the principles laid down in 6 Wendell's Rep. 484; 1 Paine's Rep. 614; Norris's Peake's Evid. 58, conjointly with 60, 108, and 109; 3 East's Rep. 222; Act of Maryland, of 1785, ch. 46, § 6.

Though the foregoing authorities do not require that the signatures be proved, to establish the authenticity of a decree or judgment — the appellants proved two of the signatures on the decree of pedigree, marked A, on p. 80, by the deposition — which, upon the principle laid down in Gresley's Eq. Evid. p. 120, and the authorities therein referred to, would be sufficient, were it deemed necessary to prove the signatures.

The seals and signatures not proved, (which are appended to the certificates, purporting to attest the signatures and seals of the Assembly of the Nobility of Grodno, and of the Court of Kobryn,) are useless appendages, the law not admitting such certificates as evidence. 13 Peters's R. 209; 2 Cranch's R. 187.

The competency of the jurisdiction of the Assembly of the Nobility of Grodno, and of the Court of Kobryn, in matters decided upon by the exhibited decrees of pedigree, &c., is proved by the depositions of witnesses skilled in law, which depositions prove also that the decree of the Assembly of the Nobility, marked A, on p. 73, falls within the scope of such as are called *in rem*, and bind everybody.

Depositions taken in the Orphans' Court are evidence in this case, upon the principle laid down in 1 Starkie on Evid. Phil. ed. of 1842, p. 315 — the more so when they were brought before the court below, through the medium of a commission taken in the case.

Independent of this witness, Judge Kalussowski was reëxamined under the commission, and another witness, Tysowski was examined under it.

The decrees, marked A and B, are as conclusive evidence to prove pedigree in this country, as they are in the country from which they come, upon principles laid down in 1 Starkie on Evid. Phil. ed. of 1842, p. 253, "Judgments *in rem*." Id. p. 30, "Reputation, in what cases evidence." 2 Starkie on Evid. id. ed. part 1, p. 842; 1 Id. 275; Norris's Peake's Evid. 101, 104–6; 1 Starkie on Evid. id. ed. 285–6, 295–6; 1 Greenleaf on Evid. §§ 525, 543; Story's Confl. of Laws, § 593.

The objection that the decree of pedigree, marked A, was obtained upon *ex parte* proceedings, &c., cannot be sustained, when it is proved that it was obtained upon such proceedings as the law of the country from which it comes prescribes, (depositions on pp. 85, 69, 70, of the record.) 4 Peters's R. 472, 475; Story's

Confl. of Laws, §§ 605, 608; Peake's Evid. 101, 104–106; 1 Greenleaf on Evid. § 547.

The city of Grodno is the capital, and the seat of the government of the Province of Lithuania, which is called Government of Grodno—just as is called the government of the United States, "Government of Washington." Encyc. Brit. vol. 10, p. 799; Cycl. of Soc. for Diff. of Useful Knowledge, vol. 11, p. 455. Hence comes the incongruity of the testimony, in calling the official seal of the nobility of Grodno "the Government of Grodno's official seal," "a Government seal of Lithuania." But that both these expressions mean to speak of the seal of the nobility of Grodno, proves the fact that both witnesses had before them the document with the seal described in its body, on p. 80 of the record, as the seal of the nobility of Grodno.

Nor can the testimony of these witnesses be impeached by giving it a different construction than the nature of the case admits of, the appellees having neglected to cross-examine them, (Starkie on Evid. Phil. ed. of 1842, pp. 197, 212, 214, 316, 317, 577,) though their counsel were present at the taking of depositions, and cross-examined one witness on other matters.

Independent of the above, witness Kalussowki explained himself as to his testimony by deposition.

The Assemblies of Nobility, when called upon to decide on pedigree, issue as many original copies of decrees as there are interested parties.

In this case, four original copies of such decree were issued, and delivered to the appellants. The original copy, of which the translation is marked A, on p. 73 of the record, is one of these four copies. None of these copies is "better evidence." Each of them is evidence of the same decree for all purposes.

Reference is made that a certain Pole, Klimkiewicz, filed a bill claiming the estate, as next of kin of Kosciusko. This individual attempted to impose in the premises—when, upon the death of the former counsel of the appellants, they had no one here to take care of their claim. This suit abated by the death of Klimkiewicz and of administrator Bomford, and its papers formed no part of the record in the court below.

The residue of Kosciusko's estate goes to the appellants, as his next of kin, upon the principle laid down in 1 Jarman on Wills, 3, 4, &c.; Civil Code of Napoleon, art. 750.

IV. Are the defendants liable to account, as is charged in the bill, on pp. 6, 8, of the record?

The decree dismissing the bill against Jonathan B. H. Smith, as administrator of the estate of Bomford, is not questioned—Bomford having died insolvent, (pp. 48, 109, of the record.)

As to the same Jonathan B. H. Smith, trustee of the property

which Bomford delivered to him as counter security, with the deed of trust, on p. 23 of the record, he is bound to account for it to the appellants, upon the principle laid down in 1 Story's Com. on Eq. § 502; Eq. Abridg. 93, K. 5; Comm. Dig. Chancery, 4, D. 6; Wright v. Morley, 11 Ves. 22. He is bound also to account, upon the same principle, for the sum of $4,156.92, for rents, &c., which he admitted to hold in his hands — in the answer on p. 49 of the record — and for such after rents as accrued since the filing of that answer.

Lewis Johnson, administrator *de bonis non* of Kosciusko's estate, in his original answer, (p. 29 of the record,) admitted, that at the time of the filing of it he had under his control stock of the Bank of Washington of the nominal value of $5,580.00 — of which the market price was then 60 per 100 — and $200 in cash. In his amended answer, (on p. 62 of the record,) he informed the court that said bank refused to pay him further dividends, under "pretence" that this stock does not belong to Kosciusko's estate; and on p. 63 of it, he admitted that he had in hands $268.28 in cash. In view of these admissions, the decree of the court below, dismissing the bill against him as administrator *de bonis non*, is erroneous; he ought to account for the cash and the certificate of the stock which he holds.

As to the liability of the sureties of Bomford:

This is the only point upon which the court below delivered a written opinion. It is not in the record, the Judges not having filed it in the case, but it will be found in a separate pamphlet, published by the appellees.

Grounds upon which the court below dismissed the bill against the sureties, are as follows:

First, because the original assets of Kosciusko having been converted into money, by Lear, the first administrator, this money and the evidences of the new investments could not (in the opinion of the court below) pass lawfully to Bomford as the administrator *de bonis non* of the estate of Kosciusko, but he ought to have administered them as Lear's executor, (pp. 9, 12, 13, of the opinion); secondly, because Bomford, administrator *de bonis non*, "converted and used" the funds of Kosciusko's estate before the date of the bonds, (id. 14); thirdly, because the act of Congress of 1846, (chap. 8,) and the bonds obtained under it, are prospective, and not retrospective, (id. 16–21); fourthly, because what is retained by the first administrator cannot go to the administrator *de bonis non*, (id. 21–24); fifthly, variances of the bonds referred to in the bill, and exhibited as evidence, were alleged, (id. 7,) but the court expressed no opinion as to it.

The counsel for the appellees made the following points, many of which were divided into subdivisions. *Mr. Coxe* argued points 1, 2, 4, and 5. *Mr. Redin,* points 7 and 8, and part of 3. *Mr. Marbury* the remaining subdivision of 3, and point 6.

The appellees, the sureties of Bomford, contend:

I. That the Circuit Court had no jurisdiction of the cause. Act of 21st Feb. 1801, § 5; 3d March, 1801, § 3; Judicial Act of 1789; Strawbridge *v.* Curtis, 3 Cranch, 267.

II. That the claim must be made through the administrator of Kosciusko's domicil.

The administration in the District of Columbia, if the domicil was, as the complainants allege, in France, was merely ancillary, and, after paying debts, &c., the residue of the estate ought to be remitted to France, to the executors under the wills of 1816 and 1817; and complainants, all being or representing foreign parties, must proceed against such foreign executors, and cannot sue the ancillary administrator here; and the bill makes no case in which a foreign distributee can maintain an action here. Story's Confl. Laws, § 513, and cases cited in the notes.

III. That if the appellants have proved themselves to be the true representatives of Kosciusko, and can claim directly, the defendants, as sureties of Bomford, as administrator *de bonis non* of Kosciusko, are not liable to them,—

1. Because the whole of the original assets were converted into money by Lear in his life, except Bank of Columbia stock; and because the money and new securities on hand at his death passed to Bomford, as executor of Lear, for distribution, and Bomford's sureties, in that capacity, if any, are answerable; that Bomford had no legal right or authority, as administrator *de bonis non,* to receive such money and securities; and the defendants, as sureties for him in that character, are liable only for what he could lawfully and rightfully receive in virtue of his office as such administrator; that their bond does not cover what is claimed.

2. Admitting Bomford came rightfully, as administrator *de bonis non,* into possession of the money and securities left by Lear, the sureties are not liable to the full extent of the complainant's claim; because Bomford wasted and converted to his own use, prior to the date of the bonds, as shown by complainant's proof, $30,625.47, part of said assets, for which the sureties are not liable, their bonds being prospective and not retrospective.

3. The third ground upon which the sureties are not liable to complainants is, that there is a fatal variance between the bonds as charged in the bill, and the bonds as exhibited by complainants to prove the charge; and further, that said bonds are void.

IV. That there is no proof in this cause that the appellants are the next of kin of Kosciusko.

V. If the complainants are the next of kin, and if there be liability on the part of the sureties, there was no intestacy by Kosciusko as to these funds; but if the will of 1798 be revoked, or its trusts cannot be carried out, then the will of 1817 disposes of the whole fund to Mr. and Mrs. Zavier Zeltner, and intercepts the claim of the next of kin.

As to the trust of the will of 1798, vide 2 Story Eq. §§ 1169, 1172, 1176; Brocket's case, 9 How.; Girard's, 2 How.; Bap. Ass'n, 4 Wheaton.

Kosciusko did not intend to die intestate as to any of his property; this is shown by his frequent wills, and by the introductory clause in the will of 1817.

The words of the will of 1817, in the introductory clause are, "*mes biens*;" in the clause of gift (the second) "*tous mes effets, ma voiture, et mon cheval y comprise.*"

Standing alone, the words are broad enough to pass his whole estate. "*Mes biens,*" meaning "estate," "what a man is worth," and "*tous mes effets.*" "all or the whole of my effects or property."

The words "*tous mes effets*" would pass the whole residue; and the introduction of the words, "my carriage and horse included," was not for the purpose of restricting or qualifying the former terms, but resulted from the testator's anxiety that those articles should pass under the general terms.

The expression is "included;" and the rule of *ejusdem generis* is inapplicable. The clause in this will of 1817 comes within the qualifying cases upon that rule, of Fleming *v.* Burrows, 1 Russ. C. C. 277; Kendal *v.* Kendal, 4 Russ. C. C. 360, (2 Wm's Ex'ors, 1019); Arnold *v.* Arnold, 2 Mylne & Keen, 365, (2 Wm's Ex'ors, 1019); Parker *v.* Marchant, 1 Younge & Collier C. C. 290; Rop. on. Leg. 210, 211.

Mr. and Mrs. Zavier Zeltner are not made parties in this bill.

VI. If there was intestacy, then it is not proved where the domicil of Kosciusko was at the time of his death; nor is the law or rule of representation or succession shown; these must be stated in the bill, and proved as stated.

The bill states that Kosciusko was a native of Poland, and died at Soleure, in Switzerland, intestate, and possessed of a large personal estate in the United States.

It is alleged that France was the domicil of the intestate at the time of his death, and that by the law of France, then in force, the succession to the whole of the said estate was cast upon the descendants of his sisters, representing the parents living at the time.

The defendants contend —

1. That there is no evidence to prove the domicil, as alleged. Mere residence, is not in itself proof of a change of domicil; it must be *animo manendi.* Story's Confl. of Laws, § 39; 1 Cur. E. R. 856; 2 Id. 897; 7 Clark & Fin. 876.

2. That the law of the assumed domicil is not set forth in the bill.

3. That there is no evidence in the case, to prove the law of France providing for the succession of an intestate's personal estate.

To prove this law, as alleged, the complainants offered in evidence a printed volume of the Code Napoleon. To the admissibility of which, for such purpose, the defendants objected; and they rely on 1 Greenleaf, §§ 487, 488; 3 Wend. Rep. 173; 5 Id. 375, 384, and 389.

The defendants also contend, that if the printed volume of the code be received as admissible, the law as contained in the Code does not entitle the complainants to the succession of said estate, as claimed by them. They refer to the Code, book 1, § 11; book 3, § 726.

VII. That proper parties are not made.

1. Lear's sureties, as administrator of Kosciusko, ought to have been made parties.

2. So ought Bomford's sureties, as executor of Lear.

3. So ought Bomford's original sureties, as administrator *de bonis non* of Kosciusko.

4. And so ought Mr. and Mrs. Zavier Zeltner, the residuary legatees in the will of 1817.

There is no averment in the bill, of the insolvency of any of the omitted sureties to excuse the omission.

The averment goes no further than that the original sureties of Bomford, as administrator *de bonis non,* are dead, and the bond is open to the plea of limitations. Story's Eq. Pl. § 169, and note 5; Madox *v.* Jackson, 3 Atk. 406; Cockburn *v.* Thompson, 16 Ves. 321, overruling Stanley *v.* Cook, Moseley's Rep. 383, &c.

VIII. That the remedy against the sureties was at law on the bond, and not in equity.

The sureties severally filed demurrers, general and special, to the complainants' bill; in support of which, they contend that the complainants have a free and unobstructed remedy at law against them on their bonds, and have, therefore, no right to bring them before the court as parties in this cause.

In the case of Richardson *v.* Jones, (3 Gill & J. 163,) it was held that a court of chancery had no jurisdiction (on petition by a trustee acting under a decree of the Chancellor to sell land,)

to order the purchaser and his sureties, who had given a bond for the purchase-money, to bring the same into court, to be paid to the trustee. The court say, the contract on this bond is a purely legal one, and can be enforced by an action at law and trial before a jury.

In the case of Boteler & Belt v. Brookes, (7 Gill & J.) 143, on petition to the Chancellor to compel the sureties in a trustee's bond (he being dead and insolvent,) to bring the proceeds of a sale made by the trustee, into court, the court held that the obligation of the sureties on their bond was purely legal, and could be enforced in a court of law only.

In Brooke v. Boteler et al. (12 Gill & J. 307,) it was held that a bill in chancery might be maintained against sureties in a bond, when there could be no remedy at law. In the particular case, the trustee being dead, insolvent, and there being no administration on his estate, there could be no order by the court for the payment of the complainants' claim. At page 317, the court say, "No person could maintain a suit at law in such case, until payment was awarded by order of the court under whose decree the land was sold, and demanded of the trustee."

The cases in 4 Munford's Rep. 289; 2 Edw. Ch. Rep. 67; 9 Porter's Rep. 697; were determined on the ground that a preliminary judgment, and execution against the administrator, was necessary to establish a *devastavit*, before suit could be maintained against sureties in an administration bond; and the court say that a complainant would be without remedy, if not allowed to sue in chancery.

It was said this would not be allowed in an ordinary case, where the administrator was alive, and within the reach of the common-law courts, and a judgment could be obtained against him. Bolton v. Powell, 8 Eng. L. and E. Rep. 165.

But by the act of Assembly of Maryland, 1798, c. 101, sub. c. 8, § 15, and sub. c. 11, § 1, distribution is to be made when the debts are paid. A distributee may sue at law on the administration bond, against the sureties, after the lapse of thirteen months, without having first obtained judgment and issued execution against the administrator. 7 Gill & J. 475.

More than thirteen months had elapsed between the filing of the new bonds and the filing of the bill. A right of action at law had accrued on the bonds before the filing of the bill.

Again; the complainants do not in their bill aver that there was a surplus in the hands of Bomford, as administrator *de bonis non*, after the payment of debts, to which they, as distributees of the estate of Kosciusko, under the French law, are entitled. Which omission, the defendants say, is bad on demurrer Stevens v. Frost, 2 Younge & Coll. 297.

Mr. Justice WAYNE delivered the opinion of the court.

The purpose of this suit is to recover for the descendants of the sisters of General Kosciusko, the funds which he owned in the United States at the time of his death.

Several points are suggested by the pleadings.

We will consider such of them as we think necessary, after having stated the origin of the fund in controversy, and the management of it, from the time that Kosciusko placed it under the care of Mr. Jefferson until the death of Colonel Bomford, the administrator *de bonis non*, in eighteen hundred and forty-eight.

General Kosciusko came to the United States early in our revolutionary war, to join our army. He did so at first as a volunteer. In October, 1776, he received from Congress the commission of Colonel of Engineers. He served with great distinction until the close of the war, and then retired from the army, after our independence had been acknowledged, with the rank of Brigadier-General. He stood prominently with those great men of our own country, with whom he had given seven years of his life to secure its freedom and nationality. He returned to Poland, poorer than when he came to us, and was, in fact, our creditor for a part of his military pay.

His subsequent career in Europe is a part of its history. All that we can say of it in connection with this case, is, that he returned to the United States after he was released from the prisons of Catherine, by her son and successor, the Emperor Paul. Whilst he was absent from the United States, a military certificate for twelve thousand two hundred and eighty dollars and fifty-four cents, had been issued, as due to him for services during the war. Not having been, for several years, in a situation to claim or to receive it, until his return to the United States, in 1798, Congress passed an act in 1799, (6 Stat. at Large, 32,) directing the Secretary of the Treasury to pay to him the amount of the certificate, with interest from the first day of January, one thousand seven hundred and ninety-three, to the thirty-first of December, one thousand seven hundred and ninety-seven. It was not a gratuity, but a simple act of justice, graduated then by the inability of our country to do more. It yet remains for us to give some national testimonial of his virtues, and of his services in the war of our independence. Seven years of peril and suffering, of wise forecast in counsels of war, and of dauntless bravery in the field, may claim from our people grateful recollections, and the expression of them in the best way that they can be commemorated by art. The cadets at West Point, unaided by the Government, have reared to his memory a monument there, and it is the only memorial of him upon the face of our land.

That military certificate, with a part of the interest upon it, was the basis of the fund now in controversy.

It was paid to Kosciusko, was invested in American stocks in his own name, and placed under the care and direction of Mr. Jefferson.

In a letter from Mr. Jefferson, in answer to one from H. E. M. De Politica, the Russian Minister at Washington, of the 27th of May, 1819, written by the latter, at the instance of the Viceroy of Poland, to make inquiries about the fund, Mr. Jefferson says: "A little before the departure of the General from America, in 1798, he wrote a will, all with his own hand, in which he directed that the property he should possess here, at the time of his death, should be laid out in the purchase of young negroes, who were to be educated and emancipated — of this will he named me executor, and deposited it in my hands. The interest of his money was to be regularly remitted to him in Europe. My situation in the interior of the country, rendered it impossible for me to act personally in the remittances of his funds, and Mr. John Barnes, of Georgetown, was engaged, under a power of attorney, to do that on commission; which duty he regularly and faithfully performed, until we heard of the death of the General. We had, in the mean time, by seasonably withdrawing a part of his funds from the bank in which he had deposited them, and lending them to the government during the late war, (with England,) augmented them to seventeen thousand one hundred and fifty-nine dollars sixty-three cents, to wit: $12,499.63, in the funds of the United States, and $4,600 in the Bank of Columbia, at Georgetown. I delayed for some time the regular probate of the will, expecting to hear from Europe, whether he had left any will there, which might affect his property here. I thought that prudence and safety required this, although the last letter he wrote me before his death, dated September 15th, 1817, assured me of the contrary, in these words: ' Nous avançons tous en age, c'est pour cela, mon cher et respectable ami, que je vous prie de vouloir bien (et comme vous avez tout le pouvoir,) arranger qu' apres la mort de notre digne ami, Mr. Barnes, quelqu'un d'aussi probe que lui prenne sa place, pour que je reçoive les interêsts ponctuellement de mon fonds; duquel, après ma mort, vous savez, la destination invariable, quant à présent faites pour le mieux comme vous pensez.'

" *Translation.*

" We all grow old, and for that reason, my dear and respectable friend, I ask you, as you have full power to do, to arrange it in such a manner that, after the death of our worthy friend, Mr. Barnes, some one, as honest as himself, may take his place,

35*.

so that I may receive the interest of my money punctually; of which money, after my death, you know the fixed destination. As for the present, do what you think best.'

"After his death, a claim was presented to me, on behalf of Kosciusko Armstrong, son of General Armstrong, of three thousand seven hundred and four dollars, given in Kosciusko's lifetime, payable out of this fund; and, subsequently, came a claim to the whole, from Mr. Zeltner, under a will made there. I proceeded, on the advice of the Attorney-General of the United States, to prove the will, in the State Court of the District in which I reside, but declined the executorship. When the General named me his executor, I was young enough to undertake the duty, although, from its nature, it was likely to be of long continuance; but, the lapse of twenty years, or more, had rendered it imprudent for me to engage in what I could not live to carry into effect. Finding, now, by your letter of May 27th, that a relation of the General's also claims the property; that it is likely to become litigious, and age and incompetence to. business admonishing me to withdraw myself from entanglements of that kind, I have determined to deliver the will, and the whole subject, over to such court of the United States as the Attorney-General of the United States shall advise, (probably it will be that of the District of Columbia,) to place the case in his hands, and to petition that court to relieve me from it, and to appoint an administrator, with the will annexed. Such an administrator will probably call upon the different claimants to interplead, and let the court decide what shall be done with the property. This I shall do, sir, with as little delay as the necessary consultations will admit; and, when the administrator is appointed, I shall deliver to him the original certificates which are in my possession. The accumulating interest and dividends remain, untouched, in the Treasury of the United States, and Bank of Columbia."

The facts of this letter are referred to and admitted, in the answer of the defendants, but we preferred to give them in the language of the writer.

Mr. Jefferson carried out his intentions, and letters of administration were granted to the late Benjamin F. Lear. He received, in different kinds of stock, and in dividends, which had accrued since the death of Kosciusko, $25,931.43$\frac{1}{2}$; $4,100.62$\frac{1}{3}$ of which, were applied by him for the payment of United States six per cents, which had been purchased on account of the estate, by the direction of the Orphans' Court, when it had the control of the fund. It is not necessary, for the purposes of this suit, to inquire into the correctness of Mr. Lear's accounts of his administration. There is nothing on the record making them

doubtful. He died in 1832, and it appears, from the books and papers from which the final account of his administration was made, that the funds in his hands had been increased to $31,-785.27. Colonel Bomford, his successor, charged himself with that sum.

The accounts of both, however, must be looked into, for another purpose. And that is, to determine, from the changes made by Lear in the funds, and in his mode of managing them, in what official relation to Lear Bomford received them, and why it is, though he did so as the executor of Lear, that the defendants in this suit, by becoming his bondsmen, under the act of the 20th February, 1846, have made themselves liable for the *devastavit* of their principal. And here we will consider that point of the case.

It appears, from the accounts of Lear, that he thought he was authorized, as administrator, to change the funds of the estate into other funds, and to lend them upon private securities, without the permission of the Orphans' Court. Most, if not all of them, in whatever way invested by him, were in his own name, at the time of his death. Bomford took them, as his executor, and settled an account with the Orphans' Court, in which he charged himself, as executor of Lear, with all the stocks, bonds, mortgages, and other securities for the payment of money, and the money of the estate, which Lear had, as administrator, at the time of his death. In fact, the funds, excepting the stock of the Bank of Columbia, were converted into money, in Lear's hands, and Bomford took them, as his executor, with the obligation, as such, to account for the same to whomsoever might be entitled to Kosciusko's estate. This being so, the question arises, whether or not his sureties, as executor of Lear, were not liable for any waste of the estate by him, instead of his sureties, as the administrator of Kosciusko, upon the ground that the latter were only liable, by their bonds, for so much as he received as administrator, and not for what he had possessed himself of, as the executor of Lear.

Bomford, it must be remembered, was the executor of Lear, and became, also, by appointment of the Orphans' Court, the administrator *de bonis non cum testamento* of Kosciusko, under the laws of Maryland, as they were of force in that part of the District of Columbia which had been a part of Maryland when Congress took jurisdiction over the same. His bonds, in both relations to the two estates of Lear and Kosciusko, were given under that law; and the obligations of himself and his sureties are determined by what has been the judicial interpretation and administration of it in Maryland, uncontrolled by any decisions of other courts elsewhere.

We understand, by the laws of Maryland, as they stood when Congress assumed jurisdiction over the District of Columbia, that the property of a deceased person was considered to be administered, whenever it was sold, or converted into money, by the administrator or executor, or in any respect changed from the condition in which the deceased left it. It did not go to the administrator *de bonis non*, unless, on the death of the executor or administrator, it remained in specie, or was the same then that it was when it came to his hands. When the assets have been changed, it is said, in Maryland, that the property has been administered. In that sense, all the funds received by Lear, and changed by him into other securities, were administered by him. If this suit, then, had been brought against the first sureties of Bomford, in his original bond as administrator *de bonis non* of Kosciusko, they would not have been answerable. For any waste of the estate of Kosciusko, the remedy would have been against him and his sureties, as executor of Lear, and if the assets had been wasted by Lear, Lear's securities would have been answerable. Nor would the circumstance that Bomford charged himself with these assets, as administrator *de bonis non*, make any difference. His sureties could be made liable only for the assets which legally came to his hands; that is, for what remained in specie, unadministered. Nor could he make them liable for more, by charging himself, in his account as administrator, with any property which had been changed by his predecessor, or administered, as it is said to be, in Maryland, when such a change is made, by an administrator or executor.

Such being the law as to the responsibility of Lear and his sureties, and of Bomford and his original sureties, it was urged in the court below, as we see from the decision of the learned Judge who gave that court's opinion, and here also in argument by the counsel of the defendants, that it applied equally to Bomford's second and third sets of sureties, who became so under the act of Congress of the 20th February, 1846. 9 Stat. at Large, 4. So the court below decided, but we think it did so erroneously. The error consists in this, that the bonds of these defendants were treated as if they were the same as the original bonds given by the first sureties of Bomford under the Maryland law, and that the relations of Bomford to the estate of Kosciusko were precisely such as they were when he came into the possession of the Kosciusko funds, as the executor of Lear. The argument was this: that as Bomford had, from the character of the assets at the death of Lear, a valid right to them, as Lear's executor, and was bound by law to administer them as Lear was, that he would not have any legal right in them as administrator *de bonis non*, to bind these defendants as

his sureties for any of his defaults; particularly as it appears from his accounts, including the last of them, that he charges himself with a balance of $43,504.40, in his ninth account; the items of which related to transactions which had taken place before the date of either of the bonds of the defendants.

Now, upon such a state of facts, it must be admitted that Bomford himself was bound for the amount stated by him to be due, in an account of assets of the estate of Kosciusko, and that his original sureties were not under the Maryland law, for those assets which had been administered by Lear.

For what purpose then, it may be asked, did the Orphans' Court call upon Bomford, after he had rendered his eighth account, to give other sureties, under the penalty, if he did not do so, that he would be displaced as administrator, and that another administrator would be appointed in his stead, unless it was to secure that amount for which he had become personally liable, though it had been originally received by him as executor, but for which there were no sureties in fact, when the defendants became so? They became his sureties under the 3d section of the act of 1846. 9 Stat. at Large, 4. That section provides, that, whenever the Orphans' Court shall be satisfied that the security which has been taken, or which may hereafter be taken from an executor or administrator, is insufficient, by reason of the removal or insolvency of any of the sureties, or because the penalty of the bond is too small, or from any cause whatever, that the court may call upon the administrator or executor to give additional security, and if there shall be a failure to comply with such order, the court is empowered to appoint another administrator in the stead of the first, and to require, from him removed, to hand over to his successor the unadministered assets, and to enforce compliance with such an order by fine and attachment or any other legal process. The act, and the proceedings of the Orphans' Court under it, towards the administrator, Colonel Bomford, cover exactly such a case as this. The object of the law, and the purpose of the court, was to get from the administrator additional and adequate security, for the funds which he had stated in his sworn account to be still unadministered in his hands, without any regard to the fact which could not then have been known to the court, whether they had been misused or not by him; but which, from his rendered account, it might properly have been inferred had not been. The act permits the court, in the cases mentioned in the 3d section, not only to take security for assets which might in future come to the hands of the administrator, but for such as he had already received and returned to the court as in his hands, or of which he ought to have made a return, and which may not have been

properly administered. If that be not the proper interpretation of the act, it would be nugatory and idle. Instead of the power of the court being enlarged by it, it would be just as powerless to act in the cases mentioned in the 3d section, as it had been under the law of Maryland. The bonds of the defendants were manifestly given with reference to the accounts which had been filed in the Orphans' Court by Colonel Bomford. They must have so understood it; for in one of them the action of the Orphans' Court, under the law of 1846, is recited, and the record shows that the sureties in the other took from their principal a counter security, to indemnify them on account of his failure to discharge all of his duties as administrator. The bonds of the defendants are distinguishable from the original bonds which the administrator gave, the latter having been given before any inventory was returned, or account stated in the court, and when no particular sum was due from the administrator; and the bonds of these defendants were given for a sum certain, returned to the court by the administrator, due by him in that character.

All of us concur in thinking that the bonds of the defendants were properly taken under the act of 1846. That the Orphans' Court called for them to secure the amount with which the administrator then stood charged, and such as he might afterwards get. They were accepted and approved by the court for that purpose, and the sureties gave them with a full knowledge of the state of the account which the administrator had filed. All of us think, also, that they are answerable for his waste, unless something else in the case can relieve them.

The first objection is, that Kosciusko did not die intestate as to his personal property in the United States, and that the same passed, by the second article of the will of 1817, to M. and Madame Zavier Zeltner, of Soleure, in Switzerland.

2. That there is no proof in the case that Kosciusko was domiciled at his death in France, and if he was, that the complainants have failed to prove what the law of France was at that date, for the distribution of the personal estate of one who dies domiciled there.

3. It is also said, that it is not proved that those persons named in the bill as being entitled to the fund sued for, have such a relationship to Kosciusko as entitled them to receive it.

We will consider these objections in their order.

Kosciusko made four wills. One of them in the United States, in 1798, which, after his death, Mr. Jefferson proved in the Court of Albemarle, in Virginia. His second will was made in Paris, in 1806, in which he charged the fund mentioned in the first will with a legacy to Kosciusko Armstrong. His third and fourth wills were made at Soleure, in Switzerland; the third

on the 4th of June, 1816, and the fourth on the 10th October, 1817. It is not denied that he made the first, second, and fourth wills, but the defendants attack the third on account, as they suppose, that the probate of it had been taken in the Orphans' Court in Washington, without due proof of its execution; and they rely upon the fourth will to show that it contains a residuary article in favor of Monsieur and Madame Zeltner, after the payment of specific legacies.

We think that all of the wills have been proved according to the rules of evidence, and that the authenticated exemplification of that of 1816, from the registry of it in France, recorded in the Orphans' Court for the District of Columbia, is all that can be required. With these wills in view, we have the means to decide the effect of them on the property in controversy.

The olographic will of 1816, contains a revoking clause. It is in these terms: " Je revoque tous les testaments et codiciles que j'ai pu faire avant le présent auquel seul je m'arrête comme contenant mes dernières volantes." Translated in the record : " I revoke all the wills and codicils which I may have made previous to the present, to which alone I confine myself, as containing my last wishes."

The right to revoke a will exists now in every nation, though the exercise of it is differently regulated. It may be done by an express revocation, or by certain acts, which of themselves infer, or from which the law infers, a revocation. "Ambulatoria est voluntas defuncti usque ad vitæ supremum excitum." Nor can one bind himself in a testament not to make another. " Nemo potest in testamento suo cavere, ne legis in suo testamento locum habeant; quia nec tempore, aut conditione finiri obligatio hæridis legatorum nomine potest." Dig. Lib. 34, tit. 4 l. 4 ; Dig. Lib. 30, tit. 1, l. 55. In England, the manner of revocation is prescribed by the 6th and 22d sections of the Statute of Frauds. In Spain and in Holland, a will may be revoked by an act confined to the revocation of that testament, without making any other disposition ; or by making another testament which expressly revokes the former, if either manner as it may be used, is executed with the forms and solemnities which the law required to give validity to the first will. By the customs of Paris and Normandy, revocations could be made by a simple declaration before two notaries, or before one notary and two witnesses, without its being done in any prescribed form. And by the same customs, a declaration in the handwriting of a testator, and signed by himself, revoked his testament, and the effect of it was to make him intestate. Law 25, tit. 1, p. 6 ; Voet. lib. 28 ; tit. 3, n. 1 ; Matth. de Success ; disp. 8, n. 18. But we learn from Touillier and from the Code Civil, that these customs

were abolished, and that in France, wills may be revoked in whole or in part, by a subsequent will, or by an act before notaries, containing a declaration of such intention. Touillier liv. 3, tit. 2; Don. et Test. ch. 5, n. 619; Pothier des Don. Test. ch. 6, § 2, § 1; Art. Code Civil, 969, 1035 – 36 – 38.

The will of 1816 was made at Soleure, while Kosciusko was sojourning there, after he had left Vienna, in 1815; whither he had gone from Paris, at the instance of the Emperor Alexander, that he might be advised with concerning the affairs of Poland. It is an olographic will, wholly written in the handwriting of the testator, according to the 970th article of the Code Civil. It gives specific legacies to persons residing in France, charged upon funds owned by the testator in France, and his executor was a notary at Morcu, in the department of Seine and Marne, which is the opening of the will, the testator says, in the department of his residence, at Berville.

Within the month of Kosciusko's death, the will was taken to Paris, and recorded there, pursuant to law. The executor having received authority from the proper tribunal to act as such, paid, according to the will, the legacies given by it. See arts. Code Civil, 999, 1000. The wills, then, of 1798 and of 1806, were revoked by the will of 1816, and as the testator did not make in it any disposition of his American funds, he died intestate as to them, unless the second article in the will of 1817, has the effect of a residuary bequest to the persons named in it.

It is, "I bequeathe all of my effects, (*effets*,) my carriage and my horse included, to Madame and to Mr. Zavier Zeltner, above named." It will be seen, by the first clause in the will, that they are the father and mother of Emilie Zeltner, to whom he bequeathed about fifty thousand francs of France, charged upon funds in England, in the hands of Thompson, Bonard & Co.

We shall be aided, in the construction of the second article of the will of 1817, by keeping in mind what were the relations between himself and the Zeltner family, as they are disclosed by his wills of 1816 and 1817. He makes them, in both wills, his legatees, except a legacy to General Baszkoyski; two small legacies to his executors; two thousand francs to the poor, and one thousand for his own burial. His chosen friends were without fortune. He says so in that memorable letter which he wrote to the Emperor Alexander, after the allies had entered Paris, in 1814; from which it may be seen, when his country was nearest his heart, that his friend was there too. Fletcher's Poland: Harp. Fam. Lib. 301; Ozinski, 4, p. 175. To the two daughters of that friend, Andrew Lewis Zeltner, with whom he had lived for fifteen years, he gives all of his funds in

France, amounting to ninety-five thousand francs, excepting a legacy to his executor. To the daughter of Zavier Zeltner, with whom he was staying when the wills of 1816 and 1817 were made, and where he died, he bequeathes fifty thousand francs; and it is to him and to his wife, that he says, I bequeathe all my effects, my carriage and horse included. From its place in the will of 1817, and from the connection of the words " all my effects, with my carriage and horse included," it would be a very strained construction, to make the words, all of my effects, comprehend his personal estate in the United States, it being neither alluded to in any way in this will, nor in that of 1816. Except in so far as it might, under the will of 1816, have been applied to the payments of the legacies given in that will, upon the failure of the funds upon which they were first charged. Effects, in French, or the word *effets*, has the same meaning in common parlance and in law, that it has in English. Its meaning properly in either, when used indefinitely in wills, but in connection with something particular and certain, is limited by its association to other things of a like kind. It is from the subject-matter of its use, that intention of something else is to be implied; and that of course may be larger or less. In some instances in wills, the word has carried the whole personal estate. When in connection with words of themselves of larger meaning, or of fixed legal import, as there were in the case of Bosley v. Bosley, decided at this term of the court, such a clause in a will is residuary. 5 Madd. Ch. Rep. 72; 6 Madd. Ch. Rep. 119; Cowper, 299; 15 Vesey, 507.

Such being the rule, it is our opinion, that the second article in the will of 1817, is not residuary, and that it has no relation to the funds in controversy.

It follows, then, that as the wills of 1798 and of 1806 were revoked by the will of 1816, and as no disposition was made in it, or in the will of 1817, of the funds in controversy, that General Kosciusko died intestate as to them, and that they may be distributed to his relations who may be entitled to inherit from him, according to the law of his domicil at the time of his death.

We now proceed to the question of domicil.

In the will of 1806, he describes himself as " an officer of the United States of America, in their revolutionary war against Britain, and a native of Lithuania, in Poland, at present residing in Paris." In the will of 1816, made at Soleure, his language is: " I, the undersigned Thaddeus Kosciusko, residing at Berville, in the township Genevraye, of the department of Seine and Marne, (being now) or at present at Soleure, in Switzerland." In the will of 1817, nothing is said of his residence. The record shows that he went from the United States

to France in 1798, that he was there in 1806, when he said he resided at Paris. There is no proof that he was not continuously in France until 1815, when he went to Vienna. We know, too, historically, that he left it in June of that year for Soleure, when he found out that it had been determined in the Congress of Vienna to erect the Duchy of Warsaw into a kingdom, without including in it his native province of Lithuania.

We do not, however permit the historical facts just alluded to, or any other of a like kind, to have any weight in forming our conclusion concerning his domicil at the time of his death. The facts in the record are sufficient for that purpose.

In the first place, his declarations that his residence was in France, in the way they were made in his wills, with an interval of ten years between them, would, upon the authority of adjudged cases, be sufficient to establish, *primâ facie*, his domicil in France. Such declarations have always been received in evidence, when made previous to the event which gave rise to the suit. They have been received in the courts of France, in the courts of England, and in those of our own country. In two questions of domicil in France, such declarations in a power of attorney, and in other instruments, were received as evidence. Denisart, tit. Domicil, § 1. In the English courts there are many cases in which like declarations have been offered and received. 5 Term Rep. 512, and the observations of Mr. Evans, axon et un 2 Poth. Obl. App. No. 16, § 11. Rawson *v.* Haigh, 2 Bing. 99; 9 Moore, 217; S. C. W. & M. 353. Lord Tenterden, 1 Bing. N. C.; 5 C. & P. 575; 1 Taylor, 376. In the United States, the case of Gorham *v.* Canton, (5 Greenleaf, 266,) is to the same effect; and in Massachusetts, in the cases of Thorndike *v.* Boston, (1 Metcalf,) and Kilburn *v.* Bennett, (3 Metcalf, 199,) it was ruled that in a case where the question of domicil was raised, the declarations and letters of a party whose domicil was disputed, were admissible in evidence, especially if made previous to the event which gave rise to the suit. We find, also, in 8 Pickering, 476, that the will of a grandfather in 1774, in which he was described as being of O. and another will, in which he is described as resident in O., were admissible evidence to prove that the grandfather had obtained a settlement at O.

Kosciusko's domicil of origin was Lithuania, in Poland. The presumption of law is that it was retained, unless the change is proved, and the burden of proving it is upon him who alleges the changes. Somerville *v.* Somerville, 5 Vesey, 787; Voet, Pand. tit. 1, 5, N. 99.

But what amount of proof is necessary to change a domicil of origin into a *primâ facie* domicil of choice? It is residence

elsewhere, or where a person lives out of the domicil of origin. That repels the presumption of its continuance, and casts upon him who denies the domicil of choice, the burden of disproving it. Where a person lives, is taken *primâ facie* to be his domcil, until other facts establish the contrary. Story's Com. 44, 6 Rule; Bruce *v.* Bruce, 2 Bos. & Pul. 228, Note 239; 3 Ves. 198, 291; Hagg. Consist. 374, 437. It is difficult to lay down any rule under which every instance of residence could be brought, which may make a domicil of choice. But there must be to constitute it actual residence in the place, with the intention that it is to be a principal and permanent residence. That intention may be inferred from the circumstances or condition in which a person may be as to the domicil of his origin, or from the seat of his fortune, his family and pursuits of life. Pothier, Introd. Gen. aux Cout. p. 4; D'Argentié, Cout. Art. 449; Touillier, lib. 1, tit. 3, n. 371; 1 Burge, Com. Confl. Laws, 42, 43. A removal which does not contemplate an absence from the former domicil for an indefinite and uncertain time is not a change of it. But when there is a removal, unless it can be shown or inferred from circumstances that it was for some particular purpose, expected to be only of a temporary nature, or in the exercise of some particular profession, office, or calling, it does change the domicil. The result is, that the place of residence is *primâ facie* the domicil, unless there be some motive for that residence not inconsistent with a clearly established intention to retain a permanent residence in another place. The facts in the case, place the residence of Kosciusko in France, under the principle just stated.

It is averred in the bill that France was his residence. The defendants deny it, admitting, however, that, from the time he left the United States, he was a sojourner in France and Switzerland until he died. But they aver that he did not remove to France at any time of his life with the intention to make it his permanent residence. And they further charge that he never did abandon the hope that circumstances would favor his return to Poland, when its political condition would permit him to resume his rights and duties as a citizen of it. Such an averment implies that he had voluntarily left Poland for France, without having been forced to do so, and that his return depended upon political contingencies, which might never happen, and which we know did not occur. It places upon the defendants the burden of proving the intention, the complainants having shown, and the defendants having admitted, that he had *primâ facie* a domicil in France. They have not done so. There is nothing in the record disproving the averment of his domicil in France, and we must, from his own declarations and other

proofs in the record, receive it as a fact that he was domiciled there at the time of his death.

The error of the argument and of the averment against Kosciusko's domicil in France is this: that they considered him a forced exile from Poland, and that he had only made France his asylum during banishment.

In such a case, it is true, a person cannot be presumed to have abandoned all hope of return to his country, whatever length of time may have passed since he was driven from it. But Kosciusko is not placed in that predicament by any proof in the case. Nor could such proof have been made; for it is well known, when he was liberated by the Emperor Paul, that it was done without restraint or inhibition of any kind. He was offered high military command and presents of princely amount, which he declined to accept. He came to the United States, and afterwards went voluntarily to France, where he lived for fifteen years. He could have returned to Poland at any time, if he had chosen to do so. Not having done so, the conclusion ought to be that he abandoned his residence there for a residence in France, which cannot be affected, as to its permanency, by any event which might have happened to induce him to change it again to the domicil of his origin. This is coincident with the fact that he had been made a French citizen by a decree of the National Assembly of France, in August, 1792. Knowing that such a naturalization would not have the effect of investing him with the privileges of a native-born citizen, if he did not become domiciled in France, unless his residence there was expressly dispensed with in the letters of naturalization, he went to France to get a civil status which he could not conscientiously enjoy in Poland whilst it continued to be under a foreign dominion. Pothier, Tr. des Personnes, &c. P. 1, tit. 2, § 3; Denesart, tit. Aubaine.

These general principles of jurisprudence in respect to domicil, by which Kosciusko's has been determined, are such as the courts of France would have ruled in this case.

Kosciusko's intestacy as to the funds in controversy, and his domicil having been determined, we will now state the law as to the right of succession in such cases.

For several hundred years upon the continent, and in England, from reported cases, for a hundred years, the rule has been, that personal property, in cases of intestacy, is to be distributed by the law of the domicil of the intestate at the time of his death. It has been universal for so long a time that it may now be said to be a part of the *jus gentium.* Lord Thurlow speaks of it as such in the House of Lords, in the case of Bruce *v.* Bruce. Erskine, in his Institutes of the Law of Scotland, (B. 3, tit. 9, § 4, 644,)

says, this rule is founded on the laws of nations. He says, "When a Scotsman dies abroad *sine animo remanendi*, the legal succession of his movable estate in Scotland must descend to his next of kin according to the law of Scotland; and where a foreigner dies in this country *sine animo remanendi*, the movables which he brought with him hither ought to be regulated, not by the law of the country in which they locally were, but that of the proprietor's *patria*, or domicil whence he came, and whither he intends again to return. This rule is founded in the law of nations, and the reason of it is the same in both cases, that since all succession *ab intestatio* is grounded upon the presumed will of the deceased, his estate ought to descend to him whom the law of his own country calls to the succession, as the person whom it presumes to be most favored by the deceased."

The law of Scotland had been different in this particular, but it was brought into harmony with the law of the rest of Europe by the decision of the House of Lords, in Bruce *v.* Bruce, 6 Brown's Par. Cases, 550, 566; 2 Bos. & Pul. 226, 230, 231; Lord Stair's Institutes, B. 3, tit. 8, § 5; Hogg & Lashley, House of Lords, June 25th, 1788; Robertson on Personal Success. 131; Omman *v.* Bingham, House of Lords, March 18, 1776; Colville & Landor *v.* Brown & Brown, Dict. Success. Ap. p. 1, 4; W. & S. 28.

The earliest case reported in the English books, is that of Pipon *v.* Pipon, Am. 6, 27. Lord Hardwicke recognized in it the rule that the personal estate, in cases of intestacy, followed the person, and becomes distributable according to the law or custom of the place where the intestate lived. Among other reasons given by him is, that a contrary rule would be extremely mischievous, and would affect our commerce. No foreigner could deal in our funds but at the peril of his effects going according to our laws, and not those of his own country. He reaffirmed the same in a few years afterwards, in Thorne *v.* Watkins, 2 Ves. 35. Lord Kenyon did the same when he was Master of the Rolls in 1787, in Killpatrick *v.* Killpatrick, which will be found cited in Robertson on Personal Succession, 116. In 1790, the House of Lords acted upon the rule, in Bruce *v.* Bruce, and two years afterwards, in Hogg *v.* Lashley. Many cases followed in the English courts, and the only question since has been, what was the domicil of the intestate at the time of his death? In the United States the rule has been fully recognized. 14 Martin, Lou. 99; 3 Paige, 182; 2 Gill & Johns. 193, 224, 228.

The rule prevails, also, in the ascertainment of the person who is entitled to take as heir or distributee. It decides, whether primogeniture gives a right of preference, or an exclusive right

36*

to take the succession; whether a person is legitimate or not to take the succession; whether the person shall take *per stirpes* or *per capita*, and the nature and extent of the right of representation. Story's Conflict of Laws.

But it is objected, before the rule can be applied in this suit against the defendants, that the complainants must prove what the law of France is for the distribution of the fund. It is said that has not been done.

For this purpose, the Code Civil of France was offered in evidence, but it was objected to.

It is true, that the existence of a foreign law, written or unwritten, cannot be judicially noticed, unless it be proved as a fact, by appropriate evidence.

The written foreign law may be proved, by a copy of the law properly authenticated. The unwritten must be by the parol testimony of experts. As to the manner of authenticating the law, there is no general rule, except this : that no proof shall be received, " which presupposes better testimony behind, and attainable by the party." They may be verified by an oath, or by an exemplification of a copy, under the great seal of a State, or, by a copy, proved to be a true copy by a witness who has examined and compared it with the original, or by a certificate of an officer, properly authorized, by law, to give the copy; which certificate must be duly proved. But such modes of proof as have been mentioned, are not to be considered exclusive of others, especially of codes of laws and accepted histories of the law of a country. In Picton's case, Lord Ellenborough said : " The best writers furnish us with their statements of the law, and that would certainly be good evidence upon the same principle as that which renders histories admissible. There is a case, continued Lord Ellenborough, in which the History of the Turkish Empire, by Cantemir, was received by the House of Lords, after some discussion. I will, therefore, receive any book that purports to be a history of the common law of Spain. B. N. P. 248, 249; 30 How. St. Tr. 492; 2 Phil. Ev. 123; 1 Salk. 281 : Morris *v.* Harmer, 7 Pet. 554; 3 Cary, 178; 11 Clark & Fin. ; Russel's Peerage Cases; 3 Wend. 173. Lord Tenterden, in Lacon *v.* Heggins, (Stark. Rep. 178,) admitted a copy of the Code Civil of France, produced by the French Consul, who stated that it was an authentic copy of the law of France, upon which he acted in his office, and that it was printed at the office for printing the laws of France, and would be acted upon in the French courts. In the Russel Peerage case, Lord Campbell said : " The most authentic form of getting at foreign law, is to have the book which lays down the law. Thus, we have had the Code Napoleon in our courts. It is better than to examine

a witness, whose memory may be defective, and who may have a bias influencing his mind upon the law." The Supreme Court of New York has held, that an unofficial copy of the Commercial Code of France, could not be proved by the French Consul residing at New York, though he stated it to be conformable to the official publications; and that it was an exact copy of the laws furnished by the French government to its Consul at New York. Had it been an official copy, and sworn to be such, by the Consul, it would have been received in evidence, as the Irish Statutes were, in Jones v. Maffet, (5 Serg. & Rawle, 523,) where they were sworn to by an Irish barrister, and that he received them from the King's printer, in Ireland. In Church v. Hubbart, (2 Cranch,) this court said, that the edicts of Portugal, offered in evidence, would have been admissible, if the copies of them had been sworn to be true copies, by the American Consul at Lisbon, instead of his having given his consular certificate, that they were true copies, because it was not one of the functions of a Consul to authenticate foreign laws in that way.

The court say, " The paper offered to the court is certified to be a copy compared with the original. It is impossible to suppose that this copy might not have been authenticated by the oath of the Consul, as well as by his certificate." It will be seen, that what the court required, was a verification of the original, upon oath, and that then the edicts would have been admissible in evidence. They were municipal edicts, too, it should be remembered, and not one of those marine ordinances of a foreign nation, on a subject of common concern to all nations, which may, according to the manner of its promulgation, be read as law, without other proof. Talbot v. Seeman, 1 Cranch, 1.

The rule of this court has always been, since those cases were decided, " that the laws of a foreign country, designed only for the direction of its own affairs, are not to be noticed by other countries, unless proved as facts; and, that the sanction of an oath is required for their establishment, unless they can be verified by some other such high authority, that the law respected not less than the oath of an individual."

The question in this case, is, has the Code Civil, which was offered in evidence, a verification equivalent to the oath of an individual?

Opinions and cases may be found in conflict with the cases cited, but, from a perusal of many of them, we find that they have been formed and decided without a careful discrimination between what should be the proof of foreign written and unwritten law; and when written laws, either singly or in statute books, or in

codes, have been offered in evidence, without a sufficient authentication that they were official publications, by the government which had legislated them; or when written laws have been offered, properly proved to be official, but which were equivocal in their terms, and in the judicial administration of which there have been, or may be, various interpretations, making it necessary to call in experts, as in cases of an unwritten law, to state how the law offered in evidence is administered in the courts of the country of which it is said to be the law. In England, until recently, it was not doubted that a foreign written law was admissible in evidence, when properly authenticated. But, in the Sussex Peerage case, 1844, (in 11 Clark & Finnelly, 115,) several of the Judges gave their opinions upon the subject. Lord Brougham, in that case, differed from Lord Campbell, and said that the Code Napoleon ought not to be received in an English court, and that before it could be received from the book, that an expert, acquainted with the text and the interpretation of it, must be called. And so it was ruled, afterwards, by Erle, Justice, in 1846, in Cocks v. Purdy, (2 C. & K. 269,) in which fragments of a code were offered as evidence. But his Lordship's opinion, and the case of Clark v. Purdy, must be taken, subject to the facts upon which the point arose. In the first, it was, whether Doctor Wiseman, who had been called as a witness, could refer, whilst giving his evidence of the law of Rome on the subject of marriage, to a book, whilst it was lying by him. In the other case, fragments of laws were offered. This point had been settled by Lord Stowell, in Dalrymple v. Dalrymple, 2 Hagg. 54. Lord Brougham again expressed the same opinion, in his sketch of Lord Stowell, in the second series of the Statesmen of the Time of George III., 76. But Lord Langdale, who also sat with the other Judges, in the Sussex Peerage case, gave the rule, with its qualifications, in the case of the Earl of Nelson v. Lord Bridport, 8 Beav. 527. After stating the rule, coincidently with the opinion of Lord Brougham, he says: " Such I conceive to be the general rule, but the case to which it is applicable admits of great variety. Though a knowledge of foreign laws is not to be imputed to the Judge, you may impute to him such a knowledge of the general art of reasoning, as will enable him, with the assistance of the bar, to discover where fallacies are probably concealed, and in what cases he ought to require testimony more or less strict. If the utmost strictness was required, in every case, justice might often stand still; and I am not disposed to say that there may not be cases, in which the Judge may not, without impropriety, take upon himself to construe the words of a foreign law, and determine their application to the case in question; especially, if

there should be. a variance or want of clearness in the testimony."

Notwithstanding the differences in the cases cited, we think that the true rule in respect to the admissibility of foreign law in evidence, may be gathered from them. In our view it is this, that a foreign written law may be received, when it is found in a statute book, with proof that the book has been officially published by the government which made the law. Such is the foundation of Lord Tenterden's ruling, in Lacen *v.* Higgens, 3 Starkie's Rep. 178. The case in 5 Sergeant & Rawle, 523, has the same basis. Though there are other reasons for the admission of the laws of the States into the courts of the United States as evidence, when they are officially published, yet they are only received when the genuineness of the publication is apparent. This court has so ruled in Hind *v.* Vattier, 5 Peters, 398, and in Owings *v.* Hull, 9 Peters, 607-625. It is true that we are called upon, as Judges, to administer the laws of the States in the courts of the United States, and that the States of the Union are not politically foreign to each other, but there is no connection between them in legislation, and we only take notice of their laws judicially, when they are found in the official statute books of the State.

With these views, it remains for us to show that the Code Civil, offered in evidence in this case by the complainants, to prove their right to the succession of the intestate estate of General Kosciusko, is authenticated in such a way that it may be received by the court for the purpose for which it was offered. It was sent to the Supreme Court, in the course of our national exchanges of laws with France. It is one of the volumes of the Bulletin des Lois, à Paris L' imprimerie royalé, with this indorsement, "Les Garde des Sceaux de France à la Court Supreme Des États Unis." Congress has acknowledged it by the act, and the appropriation which was given to the Supreme Court to reciprocate the donation. We transmitted to the Minister of Justice official copies of all the laws, resolutions, and treaties of the United States, and a complete series of the decisions of this court. We do not doubt, whenever the question shall occur in the courts of France, that the volumes which were sent by us will be considered sufficiently authenticated to be used as evidence. The gift and the reciprocation of it, are the fruits of the liberal age in which we live. We hope for a continuance of such exchanges between France and the United States, and for a like intercourse with all nations. Business men, jurists, and statesmen, will readily appreciate its advantages. It will save much time and expense when questions occur in the courts of different nations, involving the rights of

foreigners, if the written laws of every nation were verified in all of them, by certified official publications to the governments of each. In the now rapid transit of persons and property, out of the sovereignties to which they belong, into the different parts of the world, such a verification would often speed and save the rights of emigrants, sojourners, and merchants.

We think that the Code. Civil, certified to the court as it is, is sufficiently authenticated to make it evidence in this suit, and that it would be so in any other case in which it may be offered.

We proceed to state the law from it, applicable to the case.

It has been determined that the domicil of General Kosciusko was in France at the time of his death, that he died intestate as to his funds in the United States, and that they were to be distributed according to the law of his domicil.

It has been proved that he survived his parents, died without issue, and that these complainants are the lineal descendants of two of his sisters, one of whom died before her brother, and the other afterwards.

The fact of their relationship, notwithstanding the objection which was made to the proof of it, is sufficient. The proofs are decrees of the Court of Nobility, of the Government of Grodno, and, another of the Court of Kobryn, in the Russian province of Lithuania. The originals are in the Orphans' Court, and were filed in it, in the regular course of judicial proceeding. Both of them are authenticated copies of judicial proceedings in the courts from which they are brought. The competency of the jurisdiction of those courts, in the matters decided in the decrees, is proved by witnesses skilled in the law of the governments of Lithuania. Lithuania we know to be now a Russian province, governed by its own laws, except as they may be modified by the Emperor's edicts. It is divided into three governments, Wilna, Grodno, and Minsk, with a Governor-General over them. The decree of the Assembly of the Department of Grodno, is an exemplified copy of that made on the 7th May, 1843, in the case of the heirs of Kosciusko, and contains the genealogical chart of the descendants of the sisters of Kosciusko.

It is not a judgment *inter partes*, but a foreign judgment *in rem*, and is evidence of the facts adjudicated against all the world. The decree from the court of Kobryn is also proved to be a judicial record. From both we learn that the persons named in the bill of the complainants, are the collateral kinsmen of General Kosciusko. By the laws of France, they may take his estate by succession.

We shall reverse the decision of the court below, and direct the funds in controversy to be divided among them, according to the 750th article of the Code, which is, that in case of the

previous decease of the father and mother of a person dead without issue, his brother and sister, or their descendants, are called to the succession, to the exclusion of ancestors and other collaterals.

All of the objections which were made against the rendition of a decree in favor of the complainants, having been considered and overruled, it only remains for us to announce the sum for which the decree shall be given, and the proportions to be paid by the defendants, as the sureties of Bomford, under the act of. 1846.

It has been heretofore stated that these bonds were given under that act, to secure the amount then returned to the Orphans' Court by the administrator, and such assets as he might afterwards receive in that character. In his ninth account, he charges himself with a balance from the eighth account of $41,914.47, and after giving the estate credit for the sums subsequently received, and claiming credits, he admits that there was due to the estate on the 7th of June, 1847, $43,504.40, including the stock of the Bank of Washington, which was after his death transferred to Lewis Johnson, who became the administrator of Kosciusko, with the will annexed.

We shall enter a decree against the defendants for the sum of $37,924.40, with interest from the 7th June, 1847, until the same shall be paid.

The said decree is to be binding upon the sureties, Carrico, Stott, and George C. Bomford, and upon the sureties Gideon, Ward, and Smith, jointly and severally in the proportion which their respective bonds bear to the sum decreed, and the costs which have accrued in this suit. But in the event that the sureties in either bond do not pay the sum decreed against them, or any part thereof, then the sureties in the other bond shall be answerable for and pay the same to the extent of their respective bonds.

We shall also order a decree to be entered against the defendant, Lewis Johnson, not subjecting him to any costs from his having been made a defendant in this suit, directing him to turn over to the complainants the stock of the Bank of Washington, to which he is entitled as the administrator *de bonis non* of Kosciusko, and the dividends which have accrued thereon, allowing to him out of the same, the costs incurred as administrator, commissions, and such reasonable counsel fees as may have been paid by him for services in matters pertaining to this case, in the Orphans' Court, and to this suit, after his account shall be filed, and be credited to him in the Orphans' Court.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the County of Washington, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of said Circuit Court dismissing the complainants' bill in this cause, be, and the same is hereby, reversed and annulled. And this court proceeding to render such decree as the said Circuit Court ought to have rendered, doth order, adjudge and decree, as follows :

*First.* That the legal domicil of Thaddeus Kosciusko, the party under whom the complainants below claim, was, at the period of his death, in 1817, in France.

*Second.* That as to the property and fund in controversy, he, the said Kosciusko, died intestate, his will of the 4th of June, 1816, in the proceedings mentioned, having revoked his prior will of 5th of May, 1798, and 28th of June, 1806, and without disposing of said fund, and the same not having been disposed of by the will of 10th October, 1817.

*Third.* That the said property and fund is to be distributed according to the law of France, the place of his domicil at the time of his death.

*Fourth.* That by the said law of said domicil, at said period, the said property belongs in equal moieties to the collateral kindred who were the lineal descendants of the two sisters in the case mentioned, of said Kosciusko, and complainants in the bill mentioned, that is to say, one moiety thereof to Hippolitus Estho and Roman Estho, grandsons of his sister Ann, and to Louisa Narbut, her granddaughter, a widow, and in the proportions between them of one half of said moiety to said Hippolitus Estho, and the other half of said moiety to said Roman Estho and Louisa Narbut, in equal shares, — and the other moiety thereof to Vlandislaus Wankowieg, to Hippolitus Wankowieg, Adam Bychowiec, and to Michael Szyrma, also complainants, and in the proportions between them, as follows, that is to say, to Vlandislaus Wankowieg and Hippolitus Wankowieg, each of them one half of five sevenths, and of one third to each of another seventh, and to Michael Szyrma, one third of a seventh, and to Adam Bychowiec, one seventh.

*Fifth.* That the defendants' sureties in the bond of the 7th May, 1846, for $20,000, in the proceedings mentioned, taken under the authority of the act of Congress of the 20th of February, 1846, that is to say, James Carrico, Samuel Stott, and George C. Bomford, and the other defendants' sureties in the

other bond therein mentioned, also taken under said act of Congress, and dated 4th of January, 1847, for $40,000, that is to say, Jacob Gideon, Ulysses Ward, and Jonathan B. H. Smith, are each, and to the extent hereinafter decreed, responsible to the complainants for the amount also hereinafter decreed.

*Sixth.* It is further adjudged and decreed, that there is due, and that the same be paid, by said defendants, to the complainants above named, in the proportions herein stated, the sum of $37,924 $\frac{40}{100}$ with interest on said sum, at the rate of six per centum, from the 7th day of June, 1847, till paid; that is to say, that the said defendants, James Carrico, Samuel Stott, and George C. Bomford, are jointly and severally bound to pay to said complainants, of said $37,924 $\frac{40}{100}$, the sum of $12,641.46 $\frac{2}{3}$, with interest thereon as aforesaid, from the 7th of June, 1847, till paid, and one third of the costs of this suit, in both courts, and they are hereby ordered and decreed to pay the same. And that the said defendants, Jacob Gideon, Ulysses Ward, and Jonathan B. H. Smith, are jointly and severally bound to pay to said complainants, the balance of said sum of $37,924 $\frac{40}{100}$, being the sum of $25,282.93 $\frac{1}{3}$, with interest from the 7th of June, 1847, till paid, and two thirds of the said costs; and they are hereby ordered and decreed to pay the same.

*Seventh.* And it is further ordered, adjudged, and decreed, that, in the event the said sureties in the first bond, to wit: James Carrico, Samuel Stott, and George C. Bomford, do not pay the said $12,641.46 $\frac{2}{3}$, with interest, and one third of the costs, so decreed to be paid by them, as aforesaid, and every part thereof, that then the said Jacob Gideon, Ulysses Ward, and Jonathan B. H. Smith, the sureties in the second bond, as aforesaid, are bound to pay the same, and every part thereof, to the extent of the penalties of their said bond. And that, in the event that the said Jacob Gideon, Ulysses Ward, and Jonathan B. H. Smith, the sureties in the second bond, do not pay the said $25,282.93 $\frac{1}{3}$, with interest and two thirds of the costs, so decreed to be paid by them, as aforesaid, and every part thereof, that then the said James Carrico, Samuel Stott, and George C. Bomford, the sureties in the first bond, as aforesaid, are bound to pay the same, to the extent of the penalty of their said bond.

And it is further ordered, adjudged, and decreed, that the defendant, Lewis Johnson, administrator *de bonis non* of Thaddeus Kosciusko, transfer and deliver over to said named complainants the stock of the Bank of Washington, belonging to him, as such administrator, amounting at its par value, to the sum of $5,580, together with all the dividends which have accrued on the same, less the costs of his administration, and reasonable counsel fees,

and such commissions, as administrator, as the Orphans' Court may legally allow.

And it is further ordered, adjudged, and decreed, that the said sums of money and stock, so decreed to be paid and transferred by the above-named defendants, be paid and transferred to the above-named complainants, Hippolitus Estho, Roman Estho, Louisa Narbut, Vlandislaus Wankowiez, Hippolitus Wankowiez, Adam Bychowiec, and Michael Szyrma, in the proportions stated and adjudged in the preceding fourth clause of this decree.

*Eighth.* It is further ordered, adjudged, and decreed, that the decrees *pro confesso* against Roman Estho, Louisa Narbut, born Estho, Thaded Emilie Wilchelmine Zeltner, Maria Charlotte Julia Marguerette Zeltner, Bonnisant Pere, General Baszkoyski, Emilie Zeltner, Mr. and Mrs. Edward Zeltner, Zavier Amieth, Dr. Sheërer, Miss Ursula Zeltner, and Kosciusko Armstrong, by the said Circuit Court be, and the same is hereby, affirmed.

*And lastly.* It is ordered, adjudged, and decreed, that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to that court to carry the aforesaid decree of this court into effect.