Loeing-, J.,
delivered the opinion of the court :
The petitioner claims of the United States the net proceeds -of eighteen bales upland cotton, and the court finds the facts to be:
1. That the claimant' is an English subject, and in January I860, resided in the city of Savannah, in the State of Georgia, and owned and had in his possession eighteen bales of upland cotton, stored in a house numbered 148 Broughton street.
2. That the United States took possession of said cotton, by placing a military guard over it, in the house in which it was stored. That subsequently a fire broke out in the cellar in which this and other cotton was stored. That the cotton in the cellar was got out of it, some burned, some wet, some in broken bales, and some in whole bales, and some loose; that it was carried away b3r the United States and repacked and sold, and the net proceeds thereof paid into the Treasury.
That ten bales of said cotton belonged to the claimant.
That the government of England accords to its subjects and *680 aliens tbe right to prosecute claims against it by petition of yight given by the common law of England, and regulated by-statute 23d and 24th Victoria, July 3,1860, as to the mode of procedure; in-which j;he petition addressed to the King is, by his fiat indorsed thereon, directed to a court of his kingdom to hear and determine the case. The fiat, except in a very extraordinary case, is granted as a matter of right to any suppliant, subject or alien. The petition is in form addressed to the grace and favor of the King, but in practice is left at the office of the home secretary, and the fiat is then obtained as a matter of official routine.
That the petitioner had not in any way voluntarily aided, abetted, or given encouragement to the rebellion against the . government.
The evidence showed that the cláimaut purchased the eighteen bales of cotton above mentioned in the latter part of the year 1864, and removed them for storage to the house 148 Broughton street, then in the occupation of Thomas Daniels; that afterward a military guard was placed over the cotton by the United States; that a fire occurred in the cellar in which , this and other cotton were stored, and all the cotton was got out, some of it burned, some of it wet, some in whole, some in broken bales, and large quantities of it loose, and was carried away by the United States. Mr. Daniels, who was at the fire, and assisted in removing the cotton from the cellar, testified on his first examination as follows: “ I do not suppose there was any of O’Keefe’s cotton destroyed. I had eight bales destroyed ; the bales were broken and I Could not tell what part of them was burned. I should not think there was a good deal of cotton burned, but there was a good deal damaged by water.” Ón his reexamination he testified that “he did not know what cotton was burned and what was not,” nor how much that was taken out belonged to O’Keefe, nor how much was saved; and “that he waived his claim in favor of O’Keefe, because it was on his premises when burned; that he could not separate his cotton from O’Keefe’s, and gave him the benefit of all that was saved; that he himself had ten or eleven bales there.”
It is very clear that Daniels,' who, from his residence, must be presumed' to have been a rebel, could not, after the'United States had taken actual possession of the cotton by placing a *681 military guard over it, transfer any of tbe cotton, or any right in it, to the claimant. In the registration book of the claimants at Savannah there is this entry: “ James O’Keefe, February 7, ten baleá upland. Eight bales upland, stored 148 Broughton street.” But this only shows that O’Keefe claimed eighteen bales of cotton, but serves in no way to identify his bales, or to remove the uncertainty as to how much of the claimant’s cotton was burned or mingled with other cotton, or lost, or replaced to him by Daniels’s waiver of his claim in his. favor. Under the circumstances, we find the claimant entitled to the net proceeds of ten bales of cotton.
It was objected for the defendants that the petitioner was an alien and a British subject, and as such has no status in this court under the second section of the act of July 27,1868. And in reply to this the petitioner claimed that the evidence adduced by him brought him within the proviso of the section, by proving that the British government accorded to American citizens, as well as to its own subjects the right to prosecute claims, against it in its courts by the petition of right given by the common law, and regulated as to the mode of procedure by the statute of 23d and 24th Victoria, 1860.
The common law was proved by .Ed win James, esq., formerly a barrister in England, and Queen’s counsel. But it was objected that the statute was not legally proved. We think it was. brought within the rule laid down by the Supreme Court. In the case of Ennis v. Smith, (14 How., 400,) cited by the counsel for the petitioner, the court, after citing and commenting upon the cases on the point, said as follows: “Notwithstanding the differences in the cases cited, we think that the true rule in respect to the admissibility of foreign law in evidence may be gathered from them. In our view it is this, that a foreign law may be received when it is found in a statute book, with proof that the book has been officially published by the government which made the law. Such is the foundation of Lord Tenterden’s rule in Lacon v. Higgins, (3 Starkie’s Reports, p. 178.”) Now the evidence in that case was as follows: “ The vice-consul of France (called as a witness) produced a book which he said contained the French code of laws upon which he acted in his office. He stated that there was in Paris an office for the printing of the laws of France, called the royal printing office, where the laws were printed by the authority of the French government. The *682 book itself, Avliieb not only contained a body of French laws but also a commentary upon them by Mr. Lirée, purported to have been printed at that office and to contain a copy of the constitutional charter of France. The witness also stated that the book would have been acted on in any of the French courts.”
In the case before us the witness, Mr. James, produced a volume of the English statutes purporting on its title-page to be the statutes of England, printed by the printers to the Queen, and he testified thus: “I produce a. copy of the statute printed by the Queen’s printers, in England, which is made evidence in all the English courts, and it so happens that of my own knowledge I know such a statute was passed, for I was in the House of Commons at the time as a member, and took a part in the debate at the time. The statute was passed and received the royal assent on the 3d of July, 1860, and is entitled ‘An act to amend the laio relating to petitions of right, to simplify the proceedings, and to malee provisions for the cost thereof;’ and is to be found on pages 207 and 214, inclusive, of the statutes passed in the 23d and 24th years of the reign of Queen Victoria, printed by the Queen’s printers, and I can identify the volume exhibited as an authorized copy of the statutes so far as the law of England is concerned.”
This testimony brings this case within the rule laid down by the Supreme Court and Avithin the authority of the case ruled by Lord Tenterdén, and cited and approved by the Supreme Court.
It AAras objected that the allowance of the petition of right in England “ Avas a matter of grace and favor only of the sovereign, to alloAv himself to be brought into court, and not a matter of right or ex debito justiitia.”
This is true and necessarily true, for neither in England nor in this country can the sovereign be subjected to suit, except by his own consent and according to it. justice Story, in his Commentaries on the Constitution, Avheu commenting on the clause “ which extends the judicial power to controversies to which the United States shall be a party,” (§ 1675,) says as follows: “It is observable that the language used does not confer upon any court cognizance of all controversies to Avkich the United States shall be a party, so as to justify á suit to be brought against the United States without the consent of Congress, and the language was doubtless thus guardedly introduced for the purpose of *683 avoiding any suck conclusion. It is a known maxim, justified by the general sense and practice of mankind and recognized in the law of nations, that it is inherent in the nature of sovereignty not to be amenable to the suit of any private person without its own consent. This exemption is an attribute of sovereignty, belonging to it in every State in this Union, and was designedly retained by the national government.”
This is the familiar commentary on our own Constitution, which is a form of government ordained and established by the people collectively or as sovereign, for the people individually or as subjects j and the discretionary power it gives to Congress, by which this court was established for suits against the sovereign, is but his fiat, “Let right be done.” And in theory and in fact, and as a corollary'- of the maxim of jurisprudence cited by Justice Story, that it is inherent in sovereignty not to be amenable to the suit of a private person without its own consent, every suit on our docket is there by this grant and fiat of the sovereign; and this the Supreme Court declared in the case of Da Oroot, appealed to it from this court, when, spéaking in reference to suits here, they said, “The government of the United States cannot be sued for a claim or demand against it without its consent.”
Here this assent is declared by the Constitution, which is only the declaration of the sovereign’s will; and which authorized Congress and imposed it on it, as a duty, subject to its legislative discretion, as to time and mode, to provide for the trial of suits against the United States. In England the assent of the sovereign is declared by his fiat indorsed on the petition. But how the assent of the sovereign is declared cannot be material, for declared in either way it is precisely the same thing, the assent of the sovereign to be brought into court.
And certainly our legislation is cognizant of the maxims of jurisprudence and the attributes inherent in sovereignty here and elsewhere $ and I think this is shown in the language of the proviso in question here, which is, “ any government which accords to citizens of the United States the right to prosecute claims against such government in its courts.” And to accord is to grant ex gratia, and not to admit as a right.
And as to the petition of right in England the text-books show that its allowance by the sovereign on probable cause shown is held to be a duty in him, and so far a right of the sub *684 ject. Mr. Manning, in bis treatise on tbe Practice of the Court of Exchequer, page 84, says, as the prayer is granted ex debito justitia, it is called a petition of right, and that it seems to be within Magna Charta, “ Nulli vendenms, nulli negabimus, ant differemusjustitiam, vel rectum? And Justice Story says, speaking of the common law right: “In England, if any person has in point of property a just demand upon the King, he may petition him in his court of chancery by what is called a petition of right, ivlien the chancellor will administer right, theoretically as a matter of grace and not upon compulsion, but in fact as a-matter of constitutional duty? And the text-books and the evidence show that in practice, on the presentation of the petition, the fiat issues as a matter of course and official routine. Blackstone (vol. 3, p. 255) says that “as it (the law) presumes that to Icnoio of any injury and to redress it are inseparable in the royal breast, it then. issues as of course in the King’s own name his orders to his judges to do justice to the party aggrieved.” And Mr. James says, “The petition in point of fact is left with the Secretary of the Home Department, * * * and the fiat is then obtained as a mere matter of official routine?
Mr. James also said, “There might arise some case, either from political considerations or otherwise, in which the fiat might be withheld, but I can hardly imagine the existence of such a case.” And if such a case should occur, it would be an exercise of the same power that, is used in the act of July 27, 1868, which distinguishes between aliens and subjects, and between aliens, for of these it admits some to this court while it' excludes others.. If the assent of the sovereign is necessary to a suit against him, he may of course dissent.
And the objection seems to have been made in misapprehension of the purpose and effect of the fiat of the sovereign, which was to create and enforce a jurisdiction and not merely to express his personal pleasure in the matter, for that was referable to his “constitutional duty,” and his coronation oath “to'accord unto all men sure and righteous justice.” In the earliest and simplest times the sovereign administered justice, and afterward his universal jurisdiction was parcelled out in different courts as they came to be instituted, each with its limited and special jurisdiction. But there remained cases falling within none of these jurisdictions, and among them cases against the sovereign *685 as well as cases against private persons. And for those not within the jurisdiction of any of the courts, whether they were cases against the sovereign or against private individuals, the only remedy was by petition of right to the sovereign, of whom the theory was, in the words ’ of an English writer on the subject, “all the justice of the realm is hers alone, and she has the first and chiefest place upon the seat whence it is to be administered, and thereunto by the power of her oath is holden bound.” And the fiat of the sovereign, “Let right be done to the party,” indorsed on the petition and directed to the court which was to hear and determine the case, made that duty imperative on that court, whatever its special jurisdiction might be, and whatever the subject or nature of the claim might be; so that the want of jurisdiction could not be objected by the court or by anybody else, nor could the suit be barred or delayed by defences available elsewhere, such as the death of the sovereign, (in former times,) the statute of limitations, &e. Thus the fiat of the sovereign created a jurisdiction where there would have been none otherwise, and prevented a failure of justice.
On the whole case, we think it is- proved that the government of England accords to American citizens the right to prosecute claims against it in its courts by the petition of right, and we see no reason to doubt that the remedy is as practical as any against the government here or anywhere else.
And that the claimant is entitled to judgment against the United States for the net proceeds of said ten bales of cotton, amounting to the sum of $1, 904 70.