## COUNTY OF PROVIDENCE, MARCH TERM, 1870, AT PROVIDENCE.

PRESENT:

HON. GEORGE A. BRAYTON, CHIEF JUSTICE.
HON. THOMAS DURFEE, } JUSTICES.
HON. ELISHA R. POTTER, }

---

HENRY F. BARROWS *v.* JOSEPH F. DOWNS & CO.

MERIDEN BRITANNIA CO. *v.* SAME.

A person offered as a witness and expert in foreign law, may state the written law without producing it, and he may produce a copy of the statutes, or code of the foreign country, and refer to the same, for the purpose of refreshing his recollection as to the law.

A Spanish lawyer, who had practiced law in Cuba, was allowed to testify from a printed copy of the Spanish code of commerce, as to the laws regulating special partnerships in Cuba.

A special partner, who makes such representations to any parties as to his interest in his firm, his responsibility and his share of its profits, as to lead them

to suppose he is personally liable as a general partner, and to induce them thereby to sell goods to his firm, will be held liable as a general partner for all purchases so made of said parties after the date of those representations.

D. was a special partner in a limited partnership established in Cuba. The general partner purchased goods in New York city, partly by letter and partly in person. *Held*, that the extent to which he could bind his copartners and make them liable for his acts, depended on the laws of Cuba, the place where the partnership existed, and that if the general partner himself came to New York, (the special partner remaining in Cuba) his authority to bind the firm would still depend upon the laws of Cuba.

Goods were ordered from New York for a firm in Cuba, partly by letter and partly by a general partner in the said firm personally in New York, and to be paid for in New York. *Held*, that the contract must be considered as made in New York.

THESE were two actions of assumpsit, one brought by Henry F. Barrows against the defendants, to recover the sum of $8,494 39, alleged to be due on book account for goods sold and delivered, and the other by the Meriden Britannia Company, upon a promissory note for $8,467 82, made by the said J. F. Downs & Co., and also to recover the sum of $1,142 09, alleged to be due on book account for goods sold and delivered.

Service of the writ in each of these cases was made solely upon William C. Downs, described therein as one of the copartners of the firm of Joseph F. Downs & Co., the said Joseph F. Downs not being to be found within the state.

The cases were tried together by consent, and a jury trial having been waived, were submitted to the court in fact and law. The material facts are stated in the opinion of the court.

*James Tillinghast and Blodgett, for plaintiffs.*

*Payne, for defendants.*

POTTER J. These cases were tried together by consent. The debts are admitted, and the claim is against William C. Downs, as a general partner of the firm of Joseph F. Downs & Co., doing business in Havana.

As the goods were ordered by letter from Havana, or personally in New York, and were to be paid for in New York, the contract is to be considered as made in New York.

The plaintiffs rely on evidence that said William, while on a visit to this country, held himself out as a partner, and a general partner, in the firm.

The defendant denies these representations, and contends that he was only a special partner in the Havana firm, and under the Spanish law not liable as a general partner.

He testifies to a special partnership existing between him and Joseph for several years previous to 1866, the terms of which were, however, not reduced to writing until April, 1866, a copy of which he produces, and he also offers the evidence of A. F. Bramoso, a Spanish lawyer formerly of Havana, but now ˙of New York, that said verbal special partnership was valid there. Said Bramoso produced a copy of the Spanish Code of Commerce, (edition of 1823,) which he says is the code now in force in Cuba, and testified from it as to the laws regulating special partnerships in Cuba.

Said Bramoso testified that there was no common law in Cuba; and afterwards explained, that he intended by this that they had no common law composed of decisions of courts, &c., according to what appeared to be his idea of our common law.

The plaintiffs object to the admission of a copy of the agreement of April, 1866, as it appears that the original could be produced. This is a valid objection. But the written agreement, if produced, could affect but a small portion of either claim, (the greater part of each debt being incurred before its date,) and as we consider the fact of previous special partnership sufficiently proved, the partnership would be held to continue, until its termination is shown by some evidence.

The plaintiffs also objected to the admission of the Spanish Code as not sufficiently proved.

The courts have been for some time relaxing the rigor of the ancient rules in relation to the proof of foreign statutes.

In *Ennis* v. *Smith*, 14 How. 400, a copy of foreign statutes, received through the agency of the Vattemaire system of exchange, was admitted. In *Jones* v. *Moffit*, 5 S. & R. 523, a copy of Irish statutes, sworn to by a barrister as having been received from the king's printer, was received.

The United States Supreme Court, in *Talbot* v. *Seeman*, 1 Cranch, 19, lay down the rule that the laws of a foreign country, designed for the direction of its own affairs, are not to be noticed,

unless proved as facts ; and in that case they admitted an edict of France, which had been promulgated by the United States government.   And in *Church* v. *Hubbart*, 2 Cranch, 187, they say that the sanction of an oath is required, unless verified by some other high authority entitled to equal respect with an oath.

In that case, a Portuguese law and its translation were certified by the United States Consul at Lisbon.   He did not testify to them on oath.   The court say that " they are not verified by an oath," and that it was not a consular function to certify. to laws ; and imply strongly, that if there had been testimony on oath, it would have been admitted.   " It is impossible," says C. J. Marshall, " to suppose that this copy might not have been authenticated by the oath of the consul, as well as by his certificate." That this was the ground of that decision is stated in the opinion of the Supreme Court, in *Ennis* v. *Smith*, 14 How. 427, where the court say the copies would have been admitted in that case if they had been sworn to.

And in *Ennis* v *Smith*, 14 How. 400, 426, the court hold that foreign written laws may be " verified by an oath or proved by exemplification, &c.  .  .  .  .  But such modes of proof as have been mentioned are not to be considered as exclusive of others, especially as codes of law and accepted histories of the laws of a country."   And they say "that a foreign written law may be received when it is found in a statute book, with proof that the book has been officially promulgated by the government which made the law."   Ib. 429.   In *Packard* v. *Hill*, A. D. 1829, 2 Wend. 411, the court rejected a copy of a statute establishing the Court of Consulado in Havana, produced by a witness who had purchased it in Havana, and who testified that he had practiced in that court, and that the court was governed by this law. A " book purchased in a bookstore, purporting to contain the laws of a state, *unless published by authority*, would not be admitted anywhere," &c.   In the case of *Chanoine* v. *Fowler*, 3 Wend. 173, the edition of laws rejected did not purport to be an official edition.   In the case of *Queen* v. *Dent*, 1 Car. & K. 97, a witness, not of the legal profession, was admitted to prove the fact as to law.   But this decision is decidedly condemned.   See *The Sus-*

sex Peerage, 11 C. & F. 124, 134; and see Vanderdonckt v. Thel-
lusson, 8 M., G. & S., 824.

In the case of Lacon v. Higgins, A: D. 1822, 3 Stark 178, Ab-
bott, C. J. (Lord Tenterden,) admitted a copy of the French
Code, produced by the French Consul, and sworn to by him as
the one used and acted on by him, and purporting to be printed
at the Royal French Printing office, where the laws were printed
by authority. The decisions seem to have very much conflict-
ed; sometimes (as generally in New York) the written law be-
ing rejected, unless proved by exemplification. And see Rich-
ardson v. Anderson, in note to 1 Camp. 64. See also the new
English statute, 15 & 16 Victoria, ch. 96, § 7.

Chancellor Kent, in Brush v. Wilkins, 4 Johns. Ch. Rep. 506,
admitted the law of Demerara, as to succession and wills, to be
proved by a witness. The report does not indeed say that it
was statute law.

The decisions of a later date, however, have evidently tended
to allow the statute laws of a foreign state to be verified, or the
effect and construction of such law to be proved, by the oath of
a witness.

In the Sussex Peerage case, 1844, 11 C. & F., 85; Dr. Wise-
man was called as a witness to prove the laws of marriage at
Rome, and referred to a book containing the decrees of the
Council of Trent as regulating them. The judges of the com-
mittee of the House of Lords expressed their opinions severally.
Lord Brougham: "The witness may refresh his recollection by
referring to authorities," &c. Lord Lyndhurst, Lord Chancellor:
"The witness may thus correct and confirm his recollection of
the law, though he is the person to tell us what it is." Lord
Brougham agreed with the lord chancellor: "The witness may
refer to the sources of his knowldege; but the proper mode of
proving a law is not by showing a book: the House requires
the assistance of a lawyer who knows how to interpret it." Lord
Chief Justice Denman: "There does not appear to be in fact
any real difference of opinion; there is no question raised here
as to any exclusive mode of getting at this evidence, for we have
both materials of knowledge offered to us. We have the wit-

ness, and he states the law, which he says is correctly laid down in these books.   The books are produced, but the witness describes them as authoritative, and explains them by his knowledge of the actual practice of the law.   A skillful and scientific man must state what the law is, but may refer to books and statutes to assist him in doing so.   That was decided after full argument on Friday last, (June 20,) in the Court of Queen's Bench, (*Baron de Bode's case.*)   There was a difference of opinion, but the majority of the judges clearly held, on an examination of all the cases, and after full discussion, that proof of a law itself in a case of foreign law, could not be taken from the book of the law, but from the witness who described the law.   If the witness says : 'I know the law, and this book truly states the law,' then you have the authority of the witness and of the book. You may have to open the question on the knowledge or means of knowledge of the witness, and other witnesses may give a different interpretation to the same matter, in which case you must decide as well as you can on the conflicting testimony ; but you must take the evidence from the witness."

Lord Campbell concurred, saying, " The foreign law is matter of fact. . . . You ask the witness what the law is ; he may from his recollection, or on producing and referring to books, say what it is," &c.   Lord Langdale, Master of the Rolls, " Foreign law is matter of fact.   A witness more or less skilled in it, is called to depose to it.   He may state it of his own knowledge, or refer to text books or books of decisions."

Dr. Wiseman went on to testify that, by virtue of his office as Roman Catholic bishop and coadjutor to the vicar apostolic in England, " he had jurisdiction on the subject of Catholic marriages."

The Lord Chancellor :  " He comes within the description of a person *peritus virtute officii.*"   Lord Langdale :  " His evidence is in the nature of that of a judge."

It was admitted.

Mr. Westlake (Conflict of Laws, § 414, note,) seems to think that Lord Denman has overstated the result of the decision in the *Baron de Bode's case.*   It might well be supposed that the

chief justice ought to know what his own Court of King's Bench had decided, and on looking at the case in 8 A. & E., N. S. 208, we find his statement supported. A witness was offered, who testified that the feudal system in Alsace had been abolished by a decree of the French National Assembly of 1789. The decree itself was not produced. Lord Denman, Chief Justice, said that the rule admitting testimony of persons of science, applied not only to unwritten but to written law. The question was not only the contents but the state and effect of the written law. The mere contents of the law might often mislead. He then criticised the decisions in *Boehtlinck* v. *Schneider, Assignee,* 3 Esp. 58; *Clegg* v. *Levy,* 3 Campb. 166; *Millar* v. *Heinrick,* 4.Campb. 155, and refers to *Lacon* v. *Higgins,* 3 Stark. 178; *Picton's case,* 30 State Trials, 225, 491; *Middleton* v. *Janverin,* 2 Hagg. Cons. 437, 442, and says he " can perceive no distinction between proof from a copy of the law, as we find it tendered and received, and the proof now tendered." Justices Coleridge and Williams concurred, and gave their reasons at length. The written law itself, they say, would be of little use, compared with the opinion of a scientific person who could give the exact state of the law and its construction. Justice Patterson dissented, and held it necessary to produce the written law. The reasons given for his dissent go far to show the effect of the decision.

It is thus decided that an expert may state the written law without producing it. Lord Denman says that they decided that the proof of the law was to be not from the book, but from the witness; and the reasons given bear out his statement.

And it is but one step farther to decide, as was held in the *Sussex Peerage case,* that the witness may refer to the book to refresh his memory, &c.

It is true, that in the *Sussex Peerage case* the judges were not sitting as a court; but they were acting as a committee of privilege, to whom it had been referred by the House of Lords to inquire into the validity of a foreign marriage, and the House of Lords confirmed their decision. And in the last edition of Phillips on Evidence (2428, Ch. 5, §4,) the law is stated substantially in the words of that decision. See also *Lord Nelson* v.

*Bridport,* 8 Beav. 527, 535, 537, 539, &c.   Besides, in the case of the Spanish colonies, it is difficult to ascertain what their law is without the aid of an expert.   Their law is composed, partly of the various codes of Spain, and partly of the various decrees, &c., contained in the Recopilacion de Indias, and the various decrees of later date.   Some laws are in force in Spain only ; some in the colonies only ; and some are general.   Scmidt's Civil Law of Spain and Mexico.   Historical Summary.

In the *Matter of Robert's Will,* A. D. 1840, 8 Paige, 446, Chancellor Kent relied on the evidence of an expert in relation to the laws of Cuba, for the reasons we have stated above.

In the case of *Vanderdonckt* v̇. *Thellusson,* 8 M. G. & S. 812 A. D. 1849, the court, after argument, admitted a person not a lawyer, to prove the law of Belgium as to bills of exchange.   In this case it is stated in the note, that the old French Code of Commerce, (without the subsequent French modifications) was in force in Belgium.

The question before the court is, not the existence of a particular statute, but to ascertain the exact state of the law at a particular date, including its construction and effect.

In this case, the evidence offered is that of a person who testifies that he has practiced law in Havana for twenty-four years; has been the consulting lawyer of one of the tribunals, and a judge ; and the book to which he refers, purporting to be the Spanish Code of Commerce of 1823, is the code of commercial law in force in that island.

It seems to us that this book is admissible in this case, as showing the law of Cuba, and to support the evidence and refresh the recollection of the witness.

The book, even if exemplified under the great seal of Spain, could not of itself show that it was law at the present date ; and there are many cases where the evidence of a professional person, or one skilled *virtute officii,* may be much more satisfactory evidence of what the law is, than the mere exemplification of the exact words of a foreign statute, which the court may not have the necessary knowledge to construe.   And it seems to us, that the requiring an exemplified copy, is pressing the rule of

requiring the best evidence to an extent that would often defeat the ends of justice. And for the reasons we have given, the statute alone may not be the best evidence of the actual state of the law. And there can be little danger of being imposed upon by the production of a forged or supposititious document, especially in the case of a code.

Being satisfied, therefore, that the partnership in Havana was a special one and authorized by Spanish law, the next inquiry is, what is the liability of William C. Downs, the special partner in this case.

The orders for these goods were by the general partner, Joseph, by letter or personally. No goods were ever ordered by William except once,—some ear-drops from Mr. Burrows.

Now, if the parties had remained in Havana, and the general partner had made contracts abroad by letter or otherwise, there can be no doubt but that the extent to which he could bind his copartners and make them liable for his acts, would depend upon the law of the place of the partnership ; the extent to which they had made him their agent with power to bind them, would be regulated by the law of Cuba. And if the general partner himself went abroad, (the special partners remaining at home,) his authority to bind them would still be regulated by the law of Cuba. Westlake, Conflict of Laws, §§ 211, 222. Story's Conflict of Laws, § 320 a. Savigny, Private International Law, (Guthrie's edition,) 190. Fœlix, Droit International Privé, 2, § 311.

But the plaintiffs offer evidence to show that the defendant, W. C. Downs, was in New York in the summer of 1865, and there represented himself as a partner, and, as they contend, a general partner in the firm. Of course, if he was actually a general partner, he would be liable for the whole amount.

And if he was not a general partner in fact, yet if he made such representations to these parties as to his interest in the concern, his responsibility, and his share in the profits, as to lead them to suppose he was a partner personally liable, and the goods or any portion of them were advanced on the strength of his representations, then he should be liable for all so advanced.

And this is the view we take from all the evidence in the case; that the defendant should be held liable for all the goods advanced after these representations made in the summer of 1865. *Judgment for plaintiffs for $2,054 61 and costs.*