## DICKERSON v. MATHESON *et al.*

### *(Circuit Court, S. D. New York.   April 18, 1892.)*

1. SALE—PATENTED ARTICLE—NOTICE OF RESTRICTION—TRADE CUSTOMS.
   A firm in Germany having the right, under European and American patents, to sell a patented coloring matter in Europe and the United States, was in the habit of selling with restrictions against exportation to the United States. A London firm, which knew, in a general way, of this restriction, sent an order to the London agents of the German firm for a quantity of the goods "strong for export." *Held*, that it could not be presumed that these words conveyed notice of an intention to export to the United States, in the absence of proof that such was their trade meaning in London.

2. PRINCIPAL AND AGENT—NOTICE TO AGENT.
   On receiving notice of the arrival of the goods in London, the purchasers made out a check for their price, and gave it to their clerk, who, in the usual course of business, exchanged it for the invoice sent by a messenger of the seller's London agent. This invoice contained a notice of the prohibition against exporting to the United States, but the attention of the firm was not called thereto until a day or two later. *Held*, that notice to the clerk was notice to the firm, and, having accepted the goods with notice, the firm was bound by the restriction.

3. PATENTS FOR INVENTIONS—SALE WITH RESTRICTIONS—INFRINGEMENT.
   The owner of patents granted in Europe and the United States, who sells the patented article in Europe with a prohibition against importation into the United States, may treat as an infringer one who sells that article in this country. *Dickerson* v. *Matheson*, 47 Fed. Rep. 319, affirmed.

4. PRACTICE—STIPULATED EVIDENCE—SUBSEQUENT TESTIMONY.
   The parties to a cause stipulated that, in order to save the delay and expense of a commission to England, the cause should be tried as if certain evidence therein set out had been given. Afterwards, however, it became necessary to send a commission, and certain testimony was taken thereunder, but nothing was done to have the stipulation expunged. *Held* that, even if the commission was inconsistent with the stipulation, the stipulated evidence would not be disregarded on the motion of one party first made at the final hearing without notice to his adversary.

5. FOREIGN LAWS—HOW PROVED.
   Foreign laws must be proved as facts in the courts of this country, and mere citations to English statutes and authorities cannot be accepted as showing the English law.

In Equity. Suit by Edward N. Dickerson against William J. Matheson and James N. Steele for infringement of a patent. Decree for complainant.

Statement by COXE, District Judge:

On the 3d of November, 1885, Carl Duisberg, a German, obtained United States letters patent No. 329,632 for an improvement in coloring matter, known as "Benzo-Purpurine." On the 21st of December, 1885, Duisberg assigned the patent to the Bayer Company, of Ger-

many, which was the owner of a German patent for the same invention. On the 8th of March, 1888, the Bayer Company assigned the patent, including the right to recover for past infringements, to the complainant. The transaction out of which this controversy arose occurred in November, 1887. At that time another German corporation, known as the "Berlin Company," had the right, as licensee of the Bayer Company, to sell the patented color in Europe and in this country under the European and United States patents. Greeff & Co. were the London agents of the Berlin Company. On the 4th of November, 1887, Domeier & Co., of London, gave an order to Greeff & Co. for one ton of benzo-purpurine. This order contained the words "strong for export." On the 15th of November the benzo-purpurine arrived in London and Greeff & Co. notified Domeier & Co. of the fact, stating that it would be sent on in the course of the day, and requested Domeier & Co. to have check ready for payment. A check was accordingly filled out by an employe, signed by Mr. Domeier, and handed by him to a clerk, who subsequently delivered it to Greeff & Co.'s messenger in exchange for the invoice in the usual course of business. The invoice contained the following:

"NOTICE. The importation into the United States of North America of our patented substantive cotton dye-stuffs, congo, benzo-purpurine, etc., is prohibited."

The attention of Mr. Domeier was not called to this notice until a day or so afterwards. The goods were marked with a label on which was the following notice: "The importation into the United States of North America is forbidden." This label was not seen by Mr. Domeier, and did not come to his knowledge until after he had paid for the goods. The defendant Matheson, in describing the marks on the packages after their arrival in this country, does not mention the notice of prohibition on the label, the inference being that it was not there at that time. On the 25th of November, 10 days after the purchase by Domeier & Co., Barnes & Co., the defendants' London agents, shipped the goods to the defendants. The exact date of the sale to Barnes & Co. does not appear, although on November 22d they wrote the defendants as follows: "Benzo-purpurine, we have received the ton and shall forward same by steamer on Thursday." It is frequently stated in defendants' brief that Domeier & Co. were not aware of the notice on the invoice until after the property had passed out of their hands. I am unable to find the proof of this. Domeier does not so testify and the affidavit attached to Mitchell's testimony as to what he heard Domeier say, certainly, is not evidence. Domeier & Co. knew, generally, at the time they ordered the goods of the agents of the Berlin Company that benzo-purpurine was sold under restrictions against importation into this country. Barnes & Co. also knew this, and Domeier & Co.'s instructions from Barnes & Co. were not to buy unless they could do so without restrictions. The Berlin Company believed that the goods were to be used in England. On the 16th of January, 1890, counsel for the respective parties entered into a stipulation which begins as follows:

"In order to save the delay and expense of a commission to England it is hereby stipulated * * * that on the final hearing it shall be taken as though the following testimony has been given."

Then follows a statement of some of the facts and circumstances out of which the controversy arose. Subsequently, on the 27th of May, 1891, it became necessary to send a commission to England to take testimony regarding the sale to Domeier & Co. The defendants now insist that because of the commission the stipulation became inoperative and should be absolutely disregarded by the court. A witness named Mitchell, who was a member of the firm of Barnes & Co., was examined in London under the commission referred to. His examination was directed almost wholly to what he had heard Mr. Domeier say regarding the transaction. The testimony was duly objected to.

*E. N. Dickerson*, for complainant.

*Henry P. Wells*, for defendants.

Coxe, District Judge. The court cannot now disregard the stipulation of January 16, 1890. Assuming that the commission afterwards issued was inconsistent with the terms of the agreement, it was clearly the duty of defendants' counsel to move to have the stipulated evidence expunged. The complainant could then have proved in other ways most, if not all, of the facts agreed upon. It would be manifestly unfair to permit a party to come down to final hearing and then without previous notice strike from the record proof upon which his adversary has, in good faith, relied to establish his side of the controversy. However, after having read the record with care I do not recall an instance where a material fact of the stipulation has been proved untrue. In so far as the testimony of Mitchell relates to what he heard Domeier and others say it is clearly hearsay and cannot be considered.

Upon the merits the only question is one of infringement. The defendants admit having sold the patented coloring matter in this country, but they allege that they had a right to do this, having purchased it in open market without restrictions, the title coming from those who were licensed to sell it under the patents. It is argued that the bargain was originally made without restrictions and that the Berlin Company could not alter its terms by a notice upon the invoice. This contention is based upon the theory that the statement "strong for export" in the order of Domeier & Co. was notice to the vendor that the goods were to be sent to the United States. There is no foundation for such an assumption. If, when a London merchant, dealing with a Berlin merchant, uses the term quoted he means that the goods are to be exported to the United States that fact should have been proved. It cannot be inferred.

Again, it is said, that Domeier & Co. were not bound by the notice of restriction, because Mr. Domeier did not see it till one or two days after the sale was consummated, and that Domeier & Co. were not bound by the act of their clerk in accepting the invoice containing a notice printed in a foreign language. If such propositions are to receive the sanction of the courts it will be well-nigh impossible to carry on the bus-

iness of commerce. A person cannot avoid responsibility by closing his eyes and ears and delegating his business to others. If Domeier & Co. would have been bound by the notice of restriction had Domeier personally received the invoice in exchange for the check the firm is equally bound by the action of their clerk. The clerk stood in the place and stead of Domeier & Co. and represented them in that transaction. He stood for the firm precisely as a cashier represents a bank, or a purser a ship. He was acting entirely within the scope of his authority. His acts were the acts of Domeier & Co. Story, Ag. § 135. The entire invoice was in the German language, but no objection to receiving it was made on that account. Indeed, the presumption is that the invoice was perfectly understood when it is remembered that a large part of the correspondence with Domeier & Co. was carried on in that language. If the copy of the invoice printed in the record is correct, the notice was conspicuously placed and was one which Domeier would have seen and understood at a glance. The firm cannot escape responsibility by proving that one member did not know of the notice until a day or so afterwards. There is nothing in the want of knowledge by Domeier incompatible with legal knowledge by the firm, through its duly-authorized agent or otherwise, of the contents of a paper which was their voucher for the goods.

In *Steers* v. *Steam-Ship Co.*, 57 N. Y. 1, the court, at page 5, says:
"That the plaintiff herself never read the contract is of no moment. The arrangement was made by her agent, who must be presumed to have acquainted himself with the terms of the engagement which the defendant assented to."

In *Belger* v. *Dinsmore*, 51 N. Y. 166, it was said, at page 170:
"The presumption of law is that a party receiving an instrument, in the transaction of any business, is acquainted with its contents."

In *Kirkland* v. *Dinsmore*, 62 N. Y. 171, it was held that—
"A party cannot escape from the terms of a contract in the absence of fraud or imposition, because he negligently omitted to read it; and when the other party has a right to infer his consent he will be precluded from denying it to the other's injury."

It is argued that the transaction, having taken place in London, is to be governed by English law, and certain English authorities and statutes are referred to. But there is no adequate proof of what the law of England is. The rule is well established that foreign laws, written or unwritten, must be proved as facts in the courts of this country. *Pierce* v. *Indseth*, 106 U. S. 546, 1 Sup. Ct. Rep. 418; *Ennis* v. *Smith*, 14 How. 400, 426. It must, then, be held that the order of Domeier & Co. upon Greeff & Co. of November 4th did not operate as a completed sale; that the expression "strong for export" was not notice to the Berlin company, or its agents, that the goods were intended for the United States, and that the Berlin company had the right to insert the prohibition clause; that Domeier & Co., having received and retained the invoice containing this clause, accepted the goods subject to this restriction.

The simple question, therefore, is this: Whether the owner of patents,

granted in Europe and the United States, who sells the patented article in Europe with restrictions against importation into the United States, can treat as an infringer one who uses or sells that article in this country. This question is *res judicata* in this court. On the motion for a preliminary injunction it was held that "the right of the complainant to treat the defendants as infringers hinges upon the question of fact whether Domeier paid or sent his check for the benzo-purpurine * * * before he received the invoice which gave notice that the patented article was sold on condition that it was not to be used or sold in the United States." *Dickerson* v. *Matheson*, 47 Fed. Rep. 319. In other words, it was decided that the restriction would follow the goods to this country if the original sale was made subject to the restriction, and that the sale was so made if the goods were paid for after or at the time the notice on the invoice was received. To the same effect, by implication, is the case of *Holiday* v. *Mattheson*, 24 Fed. Rep. 185. If the defendants were *bona fide* purchasers led inadvertently into the attitude of infringers the court might, perhaps, be more zealous to protect them, but the impression cannot be avoided that they do not occupy such a position. The complainant is entitled to a decree.