DAVIS v. DIXON et al.

(Circuit Court, S. D. West Virginia. July 27, 1910.)

No. 421.

1. COURTS (§ 307*)—JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—CHANGE OF DOMICILE.

While a domicile once acquired by intention and acts may be held by intention alone, so far as relates to citizenship necessary to support the jurisdiction of a federal court, to constitute a change of domicile which will confer such jurisdiction, the intention must be supported by such acts as are consistent with the change, and not contradictory of it.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 854; Dec. Dig. § 307.*

Diverse citizenship as a ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

2. COURTS (§ 307*)—JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—CHANGE OF DOMICILE.

Plaintiff in an action in a federal court in West Virginia, against citizens of that state, had resided continuously on a farm in that state inherited by him from his parents, until a year or so prior to the suit, since which time he had spent a part of each winter in the South with his wife, and in going and coming had each time stayed for some days at a hotel in Richmond, Va. During most of the year he had resided on his farm in West Virginia, where his tangible personal property was situated and all his personalty was taxed. *Held* that, under such facts, his intention to make Richmond his residence, formed prior to the commencement of the action, did not effect a change of domicile such as to give the court jurisdiction on the ground of diversity of citizenship.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 854; Dec. Dig. § 307.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. COURTS (§ 307*)—JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—CHANGE OF DOMICILE.

    A change of citizenship, although for the purpose of acquiring a right to sue in a federal court, is not unlawful and does not deprive the court of jurisdiction if there is an actual bona fide change, with the intention of remaining in the new domicile.

    [Ed. Note.—For other cases, see Courts, Cent. Dig. § 854; Dec. Dig. § 307.*]

In Equity. Suit by George N. Davis against Samuel Dixon, the Stuart Collieries Company, and others. On plea in abatement challenging the jurisdiction of the court. Plea sustained, and suit dismissed.

W. R. Thompson and T. N. Read, for plaintiff.
Dillon & Nuckolls, for defendants.

KELLER, District Judge. This matter is before me upon a plea to the jurisdiction based on the allegation that the plaintiff is not really a citizen and resident of the state of Virginia, but is in fact a citizen of West Virginia, and that the suit should be dismissed by virtue of section 5 of the act of March 3, 1875, c. 137, 18 Stat. 472, as amended by Act Aug. 13, 1888, c. 866, § 6, 25 Stat. 436 (U. S. Comp. St. 1901, p. 511). The burden of proof, as well as of allegation, is upon the defendant to make out this defense to the jurisdiction by a preponderance of the evidence. Street's Fed. Eq. Prac., § 335, and cases there cited. The question was, by agreement of parties, submitted to the court in lieu of a jury upon evidence taken upon the hearing and certain affidavits and documentary evidence then filed.

From all of this evidence it appears that George N. Davis, the plaintiff, was born and raised upon a large farm in Greenbrier county, W. Va., which descended to him from his parents and upon which he has ever since his birth spent a large part of his time; that he has upon this place farm stock and farming implements, a house, and that he apparently spends by far the larger part of his time there. His family consists of himself and his wife, and it appears that in 1906 his wife was ill in a hospital in Richmond, Va., all winter, and when she came out the doctors advised that she be taken South. Since that time it appears that a portion of each winter has been passed in the South, and upon these trips some little time has been passed in Richmond, Va. (which is the gateway to the South), both in going and returning. It appears that in 1908 Mr. Davis purchased property in Richmond, Va., including a dwelling house, but has never occupied said property, and that the dwelling house is now leased to a tenant for three years; it appears, further, that up to the present year, 1910, Mr. Davis was always assessed with a capitation tax in Greenbrier county, W. Va., and that for the year 1910 he declined to be assessed for a capitation tax, but was assessed there with all of his movable personal property such as money, bonds, notes, etc., as well as with the real estate and personal property having its situs in said county; that he has never been assessed with a capitation tax

in Richmond, Va., nor with any of such personal property as follows the citizenship of the owner, such as money, bonds, notes, and the like. Mr. Davis was examined in his own behalf on July 11, 1910, and the following extracts from his testimony are here presented. On examination in chief he was asked:

"Q. State to the court where your residence is? A. Richmond, Virginia. Q. How long since you have claimed Richmond as your residence? A. I went over there in 1908, but did not claim it positively as my residence until, I think, this March. It may have been in February, but I think it was some time about the early part of March—I am not sure of the exact date—1909. Q. Have you claimed your residence to be there ever since that, and do you now claim that as your residence? A. I do, sir. Q. You have this property in Greenbrier? A. Yes, sir. Q. You live there part of the time? A. I do, sir. Q. Have you made application to register in Richmond? A. I have, sir. Q. When did you do that? A. I think it was this month, sir. Q. What part of the time have you resided in Richmond since you have claimed it as your residence? A. I went there during the winter of 1909, and I stayed there for some weeks; and I had to take my wife South—or she had gone ahead of me—and we went down there and stayed until April, if I remember correctly, and came back and stayed until warm weather. That was in 1909. During last winter I spent part of my time there, and part of the time in the South, and we went to Cuba, and came back to Richmond in April, and stayed there for a while, and I did not expect to go back to West Virginia until May, but I had some matters that called me back, and I came back, but have been in Richmond since. Q. You went there in 1909? A. Yes, sir. Q. And, as I understand you, for the purpose of making that your home permanently? A. Yes, sir. Q. And you have continued with that intention ever since? A. Yes, sir."

Cross-examination by Mr. Dillon: "Q. For what purpose did you go there? A. First, I wanted to go, it was my pleasure, and it had been my mother's request; and, in the next place I wanted what land suits I might have to be in the federal courts. Q. Your purpose was to get jurisdiction in the federal courts? A. There were other considerations. Q. That was one of the purposes? A. That is right; yes, sir. Q. That occurred to you in March, 1909? A. In 1906 my wife was in the hospital all winter, and when she came out the doctors made me take her South, and we came back there, and were attached to the place, and went there every winter afterwards, and made up our minds to reside there. Q. It was one of your purposes, you said, and that occurred to you in March, 1909? A. Oh, I could not answer that truthfully, and say it occurred to me just then. It may have occurred to me before that; I would not say that positively. Q. Was that under advice of counsel? A. No, sir. Q. Mr. Davis, how long did you live in Richmond in the winter of 1909? A. If I remember correctly—I want to give you the dates, sir—I went there in March, and I think I stayed there until April, and then went to South Carolina. Q. I said in Richmond. How long did you live in Richmond in the winter of 1909? A. All told, I presume, sir, I was there steadily for—well, I think, I have stated to you—two to three weeks the first time, and then I came back there. Q. You were there from two to three weeks in the month of March? A. I would not state that positively. Q. Where did you stay there, or board? A. At Murphy's Hotel; I would not say, two or three weeks. I was there some few days; and then went South and came back, and stayed there some few days again. Q. Where did you go to from there? A. I went to South Carolina. Q. How long did you stay in South Carolina? A. I really could not tell you—a couple of weeks. I really don't remember, to be honest with you. I stayed there for a little while; some few days. Q. A couple or three weeks, you say? A. I would not say that. I was there some days; I don't remember the dates. Q. Then when did you go back to Richmond? A. If I remember correctly, it was—really I could not state positively; but I think some time in April, but I would not state that positively, to be honest. Q. How long did you stay in Richmond that time? A. Some days. Q. About how many? A. I could not say how many; some few days.

Q. Three or four days? A. I should say along there—a week or ten days; I could not say that. Q. What hotel did you stop at then? A. At Murphy's Hotel. Q. Your wife was being treated there at that time, was she not? A. Not that spring. Q. Not that spring? A. No, sir. Q. Then when was the next time after April, in 1909, that you lived in Richmond? A. After April? Q. Yes. A. Well, I was there once or twice for a day or so during the summer, but went back there the 7th of last January. Q. The 7th of last January, how long were you there? A. I stayed there until, I think, the 27th of January, and came back to West Virginia and shipped my wife to South Carolina, and then I came to West Virginia and stayed until the 9th or 10th of February, and went then back to Richmond, and stayed there a few days and went South. Q. When you went there on the 7th of January, your wife was not with you? A. Yes; she was. Q. I understood you to say that you came back and shipped her to South Carolina. A. I said when I left there to go to West Virginia I shipped my wife South. Q. You, then, went to Richmond in January, and stayed there the month of January, 1910? A. Yes, sir. Q. You and your wife? A. Yes, sir. Q. She was taking treatment? A. Yes, sir. Q. She was there then under treatment, under what physician? A. She had been examined by experts, and the expert had given her medicine, so I would not say she was under treatment then by the physician, though she was taking the medicine. Q. While she was there? A. Yes, sir. Q. Then you went from there to South Carolina? A. That's right. Q. How long did you stay there? A. I think, sir, we got there—I think we were there a week, and left there on the 22d of February, and went from there to Cuba, and around through the South. Q. How long were you away from Richmond, down in South Carolina and Cuba? A. I think I stayed there in South Carolina a week, and on the 22d of February started to Cuba, and landed in South Carolina on the 22d of March, and stayed there a few days, and then came back to Richmond. Q. How long did you stay in Richmond, when you came back to Richmond that time? A. I could not tell you the dates. I suppose, guessing at it—it is guesswork—I think we were there at least a week, maybe ten days; I would say a week. Q. You were then at the Murphy Hotel? A. Yes, sir. Q. And you then came from there back to Ronceverte? A. I did, and saw you there. Q. And saw me there? A. I did, and shook hands with you. Q. You own a farm near Ronceverte, do you not? A. I do, sir. Q. How much? A. 576 acres in one tract, and 250 in another. Q. Where did you get that land? A. I inherited it. Q. From whom? A. One from my father, and one from my mother. Q. How long have they been in the family? A. One tract for a hundred and some years, and the other my father bought soon after the war. Q. Your father was born, and you were born and raised there? A. I was? Q. Yes. A. I was. Q. Have you any interest in the bank at Ronceverte? A. I am a very small stockholder in one bank there. Q. And a director? A. I am; yes. Q. Do you attend the directors' meetings? A. No, sir, have been but to one this year. Q. What time was that? A. I could not tell you that to save my life. I think it was in May. I went there twice, but the second time there was no meeting, and I walked out. Q. Have you any other interests in West Virginia? A. Yes, sir. Q. Where? A. Well, I have some lands in Fayette, some in Raleigh, and some in Nicholas—scattered around. Q. Yes? A. Little pieces; yes, sir. Q. What is the value of your property in West Virginia? A. I could not tell you that, to be honest. (Objected to.) Q. Where is your household and kitchen furniture? A. In Greenbrier county, except some I have in Richmond, a little bit, stored away there, but my principal furniture is in Greenbrier. Q. Did you ever keep house in Richmond? A. No, sir; I never did. Q. Have you a house there? A. I have. Q. When did you buy it? A. On the 19th day or the 29th day of June, 1908. Q. Is that house leased? A. It is rented now; yes, sir. Q. For how long? A. Three years, so my real estate man tells me. I don't know that. Q. You bought a dwelling house in Richmond in 1908? A. Yes, sir. Q. And rented it for three years? A. I didn't rent it; my agent did. Q. You had your agent to rent it out? A. Yes, sir; I did. Q. And you have never kept house in Richmond, Virginia? A. Never. Q. And what time you were there, for a week, ten days or two weeks, you lived in a hotel. A. Yes, sir. Q. And your wife was taking treatment from a physician there. A. Not all

the time. She has taken treatment, but not all the time. Q. You are assessed for the year 1909 with your personal property in Greenbrier county? A. That's right. Q. And for the year 1910 you are assessed with all of your personal property in Greenbrier county, West Virginia? A. That's right. Q. Is the farm in Greenbrier county the home place of your mother and father? A. Is it what? Q. The home place of your mother and father, the farm in Greenbrier county, that you own? A. It is; that's right. Q. It has been in the family and has come down for many long years? A. One of them has. The other has not."

Redirect examination by Mr. Thompson: "Q. Have you been summoned to jury service since you changed your residence? A. I have, sir. Q. Did you serve? A. No, sir. Q. Have you paid any capitation tax since you changed your residence to Richmond, in Greenbrier? A. No, sir. Q. Have you refused to do so? A. Yes, sir."

Recross-examination by Mr. Dillon: "Q. You simply refused to pay the capitation tax for the year 1910? A. That is right. Q. You did not have yourself assessed with capitation or any taxes in the city of Richmond? A. No, sir; I went to the assessor's office, and gave in, I think, one hundred dollars' worth of stuff I had there. I have forgotten just what, but I went to the assessor's office myself. and put it in. Q. Have you seen the certificate— A. (interposing) I heard you read it. Q. (concluded)—of the treasurer of the city of Richmond? A. Yes, sir; I heard you read it, but I went to that office myself and gave it in. Q. One hundred dollars' worth of what? A. He said, on personal property. He said, 'You've moved here, and we can put it in as money, or anything, but you must give in something,' and I said, 'All right; here is a hundred dollars' worth,' and I put it in that way. Q. Didn't you do that for the sole purpose of undertaking to make out a case? A. No, sir; I did not. Q. Didn't you do that for the purpose of undertaking to make out a case of citizenship in Richmond? A. No, sir; I could not state that. Q. He didn't. assess it, did he? A. He told me he did. I saw him write it down. Q. Did you have yourself assessed with poll tax there? A. No, sir. Q. Why didn't you? A. Because I could not vote there before two years any way. Q. Why didn't you have your money assessed in Richmond, Virginia, where you were a resident? A. Well, I don't know that I have any special reason for that. The assessor came along and I gave it to him. Q. Were you in Richmond when you had your one hundred dollars assessed? A. Yes; and afterwards. Q. How is that? A. Yes; I was there—some time in February, it was, I think. Q. Why didn't you have your personal property assessed in Richmond then? A. Because it had been assessed here in West Virginia. Q. Isn't it true— Why didn't you refuse to have it assessed in West Virginia when the assessor came around on the 3d of February? A. As a matter of fact I had been told that it was a matter of indifference where I had my personal property assessed. That is the reason—to be honest with you—I was so advised by my attorney. Q. Then it was because you were told that it made no difference where it was assessed, with reference to constituting yourself a citizen? A. Yes, sir. Q. You inquired about that? A. I asked the question, where I had better give my property in, and he said, 'It makes no difference where you give in your property.' Q. Of whom did you ask that question? A. My attorneys. Q. You wanted to undertake to make yourself a citizen by inquiring of your attorneys where you would have your property assessed? A. I inquired of them, because I wanted to comply with the law. Q. Did you ask your attorneys about it before you had it assessed? A. It was after I had given it in. I said, 'I have given in my property. I do not reside in this state. What about it?' and he says, 'I don't know that it makes any difference.' And that was all there was to it. Q. Have you any family, other than your wife? A. Not living; no sir. Q. Where is she now? A. In Greenbrier county, West Virginia. Q. That is, at the old home place? A. Yes, sir. Q. And you are living there now? A. Yes; I am there for the summer."

Upon the whole of this testimony I am forced to the conclusion that the acts of Mr. Davis have not corresponded with his announced

184 F.—33

intention of taking up his residence in Richmond and becoming a citizen of Virginia. I have no reason to doubt the truth of his statement that in 1909 he formed the intention of changing his citizenship, and that at least one purpose, if not the only purpose, was to enable him to sue in the federal courts of West Virginia. Such a purpose is not unlawful. As is said in Hughes' Federal Procedure, p. 247:

"It has sometimes happened that a citizen changes his citizenship for the purpose of acquiring a right to sue in the federal courts. If his change is an actual, bona fide change, and he removes and takes up his domicile in a new place, with the intention of remaining there, then the federal court would have jurisdiction, and the single fact that it was his intention to confer jurisdiction would not defeat it."

However, it has also been held by the Supreme Court of the United States in the case of Morris v. Gilmer, 129 U. S. 315, 328, 9 Sup. Ct. 289, 293, 32 L. Ed. 690, that in order to effect such a change of domicile as constitutes a change of citizenship, "there must be * * * an actual residence in this place, with the intention that it is to be a principal and permanent residence"—quoting from Ennis v. Smith, 55 U. S. 400, 423, 14 L. Ed. 472.

While it is difficult to lay down with exactness any rule to determine just what will constitute a change of domicile by choice, it is evident that mere intention without corresponding acts will not suffice. A domicile once acquired by intention and acts may doubtless be held by intention alone so far as would be necessary to support the jurisdiction of a court, but in the event of a change of domicile the intention must be supported by such acts as are consistent with the change and not contradictory of it. Actions are said to sometimes speak louder than words, and when they point to an apparent intention at variance with that announced, they are certainly entitled to great weight in determining the question whether a real change of domicile has been effected.

In the case at bar there has been no family residence in Richmond since the alleged intention of establishing a residence there was formed in 1909. At the most, a very few weeks in the winter, passed as guests at an hotel, is all that can be claimed in that regard; the great bulk of each year being spent at the West Virginia farm which had always been the family home. No poll tax, nor tax upon such intangible personal property as follows the residence of its owner, was paid in Richmond in 1909 or 1910, but on the contrary both were paid in West Virginia for 1909, and intangible personalty to the value of $22,000 was assessed in West Virginia in 1910, which, if in fact Mr. Davis resided in Richmond, should have been there assessed, and the assessment of which in West Virginia was inconsistent with his citizenship elsewhere. I do not think that the evidence in this case shows an "actual residence in the place with the intention that it is to be a principal and permanent residence" as held necessary in Morris v. Gilmer, supra. There is nothing in the evidence to indicate that at any time when Mr. Davis went to Richmond he went there with any present intention to remain there per-

manently or for an indefinite time, but, on the contrary, merely for short definite periods which served as little interludes between journeys to the South during the winters and returns to the ancestral home for the great bulk of the year.

In Butler v. Farnsworth, 4 Wash. C. C. 101, 103, Fed. Cas. No. 2,240, Mr. Justice Washington said:

"If the removal be for the purpose of committing a fraud upon the law, and to enable the party to avail himself of the jurisdiction of the federal courts, and that fact be made out by his acts, the court must pronounce that his removal was not with a bona fide intention of changing his domicile, however frequent and public his declarations to the contrary may have been."

I conclude that the effect of all the evidence is to sustain the plea to the jurisdiction, and a judgment may be entered in accordance with this opinion, dismissing this suit for lack of jurisdiction under the provisions of section 5, Act March 3, 1875, as amended by Act Aug. 13, 1888, and without prejudice to the institution of any other suit in any court of competent jurisdiction for the same cause of action.